[No. D054439. Fourth Dist., Div. One. Mar. 5, 2010.]

ANGELINA MIKE, Plaintiff and Appellant, v.
FRANCHISE TAX BOARD, Defendant and Respondent.

818

###### COUNSEL

Sheppard Mullin Richter & Hampton, Richard M. Freeman and Carole M. Ross for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Paul D. Gifford, Assistant Attorney General, W. Dean Freeman, Tim Nader and Leslie Branman Smith, Deputy Attorneys General, for Defendant and Respondent.

###### OPINION

**McDONALD, J.**—Plaintiff Angelina Mike is an American Indian and an enrolled member of the Twenty-Nine Palms Band of Mission Indians (the Tribe). She does not live on the Tribe's reservation, but resides on the reservation of a different tribe. In 2000, Mike received a distribution from gaming operations conducted on the Tribe's reservation (the income). The question is simply stated—may the State of California collect income taxes on the income? That question appears to be a matter of first impression in California, and requires us to navigate complex currents of decisional and statutory law.

Defendant Franchise Tax Board (FTB) concedes that, if Mike had lived *within* the boundaries of the Tribe's reservation, the *McClanahan*[1] exemption would bar California from collecting income taxes on the income derived from sources on the Tribe's reservation. Conversely, Mike does not dispute that, if she resided in California *outside* the boundaries of any "Indian Country" (see fn. 5, *post*), there would be no bar to California taxing the income. This matter falls in an interstice of decisional law that has produced conflicting decisions by other courts: may a state impose income taxes on

---

[1] *McClanahan v. Arizona State Tax Comm'n* (1973) 411 U.S. 164 [36 L.Ed.2d 129, 93 S.Ct. 1257] (*McClanahan*).

income received by an enrolled member of a tribe from his or her tribe's reservation activities when that member resides on the reservation of a *different* tribe? We conclude the answer is yes, and we therefore affirm.

I

## FACTUAL AND PROCEDURAL BACKGROUND

Mike is an American Indian and is an enrolled member of the Tribe. The Tribe is small, with only 12 members over the age of 18, and its reservation consists of an approximately 240-acre section near the city of Coachella (portion 1) and an approximately 160-acre section near the city of Twentynine Palms (portion 2). Portion 1 has two parcels, one of which is developed with a casino and parking lot that opened in 1995,[2] and a second parcel near a sanitation plant. Portion 2 is many miles away from portion 1 and consists of undeveloped desert land. Portion 2 has no connections to electrical, water, or sewer facilities, and has no developed roads or other infrastructure.

During the relevant tax year, Mike did not live on the Tribe's reservation. Instead, Mike resided on the reservation of another federally recognized tribe (the Agua Caliente Band of Cahuilla Indians (Agua Caliente Band)) approximately 18 miles from the Tribe's reservation.[3]

In tax year 2000, Mike received more than $385,000 as her per capita distribution from the Tribe's gaming operations on its reservation. She filed her California income tax return and sought a refund of the amounts withheld by the Tribe for California income taxes. Although FTB issued her a refund for the taxes attributable to Mike's per capita distribution from the Tribe's gaming operations, FTB subsequently ruled she was not entitled to a refund and issued a notice of assessment for principal and interest. After Mike exhausted her administrative remedies, she paid the assessment and filed this action seeking a refund of the income taxes she paid attributable to the income from the Tribe.

The trial court ruled that because Mike did not reside on the Tribe's reservation, the income she received from the Tribe was taxable by California, and entered judgment in favor of FTB. This appeal followed.

---

[2] Prior to 1995, the Tribe had virtually no income. However, the casino generates substantial income for the Tribe.

[3] There was testimony from experts that, although the Tribe and the Agua Caliente Band are distinct political units, they share many historical, familial, social, and genetic ties.

## II

### ANALYTIC FRAMEWORK

FTB contends the *McClanahan* exemption applies only when the taxpayer resides on tribal lands of his or her own tribe, and is unavailable when the taxpayer resides on lands of a different tribe. Mike contends the *McClanahan* exemption applies when the taxpayer resides in *any* "Indian Country," including lands of a tribe in which the taxpayer is not a member. To evaluate the parties' contentions, we examine the genesis of the applicable standards.

### A. *General Principles*

The income of a California resident is ordinarily taxable by California regardless of the source of that income. (Rev. & Tax. Code, § 17041.) The United States Supreme Court has held it is permissible for a state (as well as the federal government) to impose an income tax on all of the income of its residents, even if that income is earned outside the borders of the taxing authority's jurisdiction. (*Oklahoma Tax Comm'n v. Chickasaw Nation* (1995) 515 U.S. 450, 462–467 [132 L.Ed.2d 400, 115 S.Ct. 2214] (*Oklahoma Tax Comm'n*) [state may impose income tax on enrolled member for income earned from tribal employment if member resides outside of "Indian Country"].)

### B. McClanahan *and Its State Court Descendants*

The ability of states to exert jurisdiction over Indian tribe members within their borders, including the ability to impose taxes on members, has long been constrained. Reflecting a "policy of leaving Indians free from state jurisdiction and control [that] is deeply rooted in the Nation's history" (*Rice v. Olson* (1945) 324 U.S. 786, 789 [89 L.Ed. 1367, 65 S.Ct. 989]), the United States Supreme Court as early as 1832 rejected a state's efforts to extend its criminal jurisdiction to reservation lands in *Worcester v. State of Ga.* (1832) 31 U.S. (6 Pet.) 515 [8 L.Ed. 483], reasoning that Indian nations were "distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guarantied by the United States." (*Id.* at p. 557.) From this concept of Indian reservations as constituting sovereign (although dependent) nations, *Worcester* reasoned state law could have no role to play within the reservation boundaries because "[t]he Cherokee nation . . . is a distinct community occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the

assent of the Cherokees themselves, or in conformity with treaties, and with the acts of [C]ongress. The whole intercourse between the United States and this nation, is, by our [C]onstitution and laws, vested in the government of the United States." (*Id.* at p. 561.)

Although *Worcester v. State of Ga.* evaluated a state's efforts to extend its criminal jurisdiction to reservation lands, its rationale applied equally to state efforts to impose taxes within the reservation. For example, in 1867, the United States Supreme Court employed the same rationale to reject a state's effort to impose a land tax on the reservation lands granted to Indians, stating "[i]f the tribal organization of the Shawnees is preserved intact, and recognized by the political department of the government as existing, then they are a 'people distinct from others,' capable of making treaties, separated from the jurisdiction of Kansas, and to be governed exclusively by the government of the Union. If under the control of Congress, from necessity there can be no divided authority." (*The Kansas Indians* (1866) 72 U.S. (5 Wall.) 737, 755 [18 L.Ed. 667].)

Although other tax cases involving Indians were decided over the next century, the "seminal case in the area of American Indian income taxation" (*LaRock v. Wisconsin Dept. of Revenue* (2001) 241 Wis.2d 87, 95–96 [2001 WI 7, 621 N.W.2d 907] (*LaRock*)) was *McClanahan*.[4] In *McClanahan*, the court was required "to reconcile the plenary power of the States over residents within their borders with the semi-autonomous status of Indians living on tribal reservations." (*McClanahan, supra*, 411 U.S. at p. 165.) *McClanahan* involved an attempt by the state of Arizona to impose an income tax on an enrolled member of the Navajo tribe who both lived on, and earned her income from sources within, the Navajo reservation in Arizona. (*Id.* at pp. 165–166.) The court, synopsizing the question it was confronting, stated: "It may be helpful to begin our discussion of the law applicable to this complex area with a brief statement of what this case does not involve. We are not here dealing with Indians who have left or never inhabited reservations set aside for their exclusive use or who do not possess the usual accoutrements of tribal self-government. [Citations.] Nor are we concerned with exertions of state sovereignty over non-Indians who undertake activity on Indian reservations. [Citations.] Nor, finally, is this a case where the State seeks to reach activity undertaken by reservation Indians on nonreservation lands. [Citation.] Rather, this case involves the narrow ques-

---

[4] The other cases, which did not address income taxes on individuals, concluded the taxes were improper but employed rationales different from the sovereignty and preemption rationales described in the earlier cases. (*McClanahan, supra*, 411 U.S. at p. 169 ["some of the later Indian tax cases turn, not on the Indian sovereignty doctrine, but on whether or not the State can be said to have imposed a forbidden tax on a federal instrumentality"].)

tion whether the State may tax a reservation Indian for income earned exclusively on the reservation." (*Id.* at pp. 167–168.)

After surveying the development of American Indian law from its earliest origins, *McClanahan* concluded that the analysis of whether a state may assert jurisdiction over Indians has shifted from concepts of inherent Indian sovereignty toward federal preemption principles (*McClanahan, supra*, 411 U.S. at p. 172 ["[t]he modern cases thus tend to avoid reliance on platonic notions of Indian sovereignty and to look instead to the applicable treaties and statutes which define the limits of state power"]), although the court cautioned the Indian sovereignty doctrine remained relevant "not because it provides a definitive resolution of the issues in this suit, but because it provides a backdrop against which the applicable treaties and federal statutes must be read." (*Ibid.*) *McClanahan* then observed that considering the 1868 treaty between the Navajo Nation and the United States government, "it cannot be doubted that the reservation of certain lands for the exclusive use and occupancy of the Navajos and the exclusion of non-Navajos from the prescribed area was meant to establish the lands as within the exclusive sovereignty of the Navajos under general federal supervision." (*Id.* at pp. 174–175.) The Court further stated that "since the signing of the Navajo treaty, Congress has consistently acted upon the assumption that the States lacked jurisdiction over Navajos living on the reservation" (*id.* at p. 175), and noted provisions in both the Arizona Enabling Act (36 Stat. 557) and the Buck Act (4 U.S.C. §§ 105–110) contained language implying the income of a Navajo living on and derived from the Navajo reservation was exempt from state income taxation (411 U.S. at pp. 175–176).

*McClanahan* unequivocally held a state may not impose an income tax on tribal members whose income is derived from their own tribe's lands and who reside on their own tribe's land.[5] For many years after *McClanahan*, several state courts held the *McClanahan* exemption extended to an Indian whose source of income was from "Indian Lands" and who resided on "Indian Lands," regardless of whether the source of income and/or place of residence were lands set aside for a tribe in which he or she was a member.

---

[5] The court subsequently explained that, although residence is an important component of the *McClanahan* exemption, the residence component was not limited to those Indians residing on a formal reservation, but instead extended to "tribal members living and working on land set aside for those members." (*Oklahoma Tax Comm'n v. Sac and Fox Nation* (1993) 508 U.S. 114, 124 [124 L.Ed.2d 30, 113 S.Ct. 1985] (*Sac and Fox*).) The *Sac and Fox* court concluded the exemption was equally available to those tribal members who lived on the reservation, or on "allotted lands," or in "dependent communities." (*Id.* at pp. 124–126; see generally Cohen, Handbook of Federal Indian Law (2005 ed.) § 3.04[2][c], pp. 188–196 [explaining component types of lands within definition of "Indian Country"].)

(See *LaRoque v. State* (1978) 178 Mont. 315, 324 [583 P.2d 1059] ["situs of the activity is the primary factor in determining whether state taxation jurisdiction exists, not the status of the individual as enrolled or non-enrolled" (italics omitted)]; *Topash v. Commissioner of Revenue* (Minn. 1980) 291 N.W.2d 679, 680–681 (*Topash*) [enrolled member of the Tulalip Tribe living within the Red Lake Indian Reservation and employed there by Bureau of Indian Affairs (BIA) not subject to income tax]; *White Eagle v. Dorgan* (N.D. 1973) 209 N.W.2d 621; *Fox v. Bureau of Revenue* (1975) 87 N.M. 261 [531 P.2d 1234] [Comanche Indian residing on the Navajo Reservation was not subject to state income tax for earnings as an employee of the BIA], overruled in *New Mexico Taxation and Revenue Dept. v. Greaves* (1993) 116 N.M. 508, 509 [864 P.2d 324].) Federal district courts generally reached the same conclusion. (See *Dillon v. State of Mont.* (D.Mont. 1978) 451 F.Supp. 168, 175, revd. on other grounds (9th Cir. 1980) 634 F.2d 463; *Confederated Salish and Kootenai Tribes of Flathead Reservation, Montana ("Tribes") v. Moe* (D.Mont. 1974) 392 F.Supp. 1297, 1312, affd. on other grounds *sub nom. Moe v. Salish & Kootenai Tribes* (1976) 425 U.S. 463, 480, fn. 16 [48 L.Ed.2d 96, 96 S.Ct. 1634] (*Moe*).)

C. *Colville*[6] *and Its Impact on the State Court Views*

*McClanahan* employed the term "reservation Indian" to describe the class of persons exempt from Arizona's income tax, but the factual context presented in *McClanahan* did not require the court to further refine that term. However, subsequent United States Supreme Court cases recognized that distinctions may properly be drawn between members of a tribe and non-member Indians residing on another tribe's reservation, and these cases suggested that an expansive reading of *McClanahan*'s use of the term "reservation Indian" required reevaluation.

In *Moe, supra,* 425 U.S. 463, the Supreme Court held that under *McClanahan* a state could impose a sales tax for on-reservation sales of cigarettes to non-Indians (*Moe,* at p. 483), but could not impose such a tax for on-reservation sales of cigarettes to "Indians." (*Id.* at pp. 480–481.) In so holding, however, *Moe* expressly noted that because the state had *not* asserted the tax could be applied to nonmember Indians residing on the reservation (or to Indians living off of the reservation) it would not decide those issues. (*Id.* at p. 480, fn. 16.)

The issue left undecided in *Moe* was subsequently decided in *Colville*, in which the Supreme Court explicitly marked a distinction between Indians

---

[6] *Washington v. Confederated Tribes* (1980) 447 U.S. 134 [65 L.Ed.2d 10, 100 S.Ct. 2069] (*Colville*).

living on the lands of another tribe and those living on their own tribal lands. In *Colville*, the court confronted the issue of whether the State of Washington could impose sales and use taxes on Indians residing on the reservation of another tribe. The court, noting that it was apparent after "*McClanahan* that the sales tax could not be applied to similar purchases by tribal members" (*Colville, supra*, 447 U.S. at p. 160), reasoned "[f]ederal statutes, even given the broadest reading to which they are reasonably susceptible, cannot be said to pre-empt Washington's power to impose its taxes on Indians not members of the Tribe." (*Ibid.*) In support of the distinction between Indians residing on the lands of another tribe and tribal members residing on their own lands, the Court addressed the issue of tribal sovereignty: "Nor would the imposition of Washington's tax on these purchasers contravene the principle of tribal self-government, for the simple reason that nonmembers are not constituents of the governing Tribe. For most practical purposes those [nonmember resident] Indians stand on the same footing as non-Indians resident on the reservation. There is no evidence that nonmembers have a say in tribal affairs or significantly share in tribal disbursements. We find, therefore, that the State's interest in taxing these purchasers outweighs any tribal interest that may exist in preventing the State from imposing its taxes." (*Id.* at p. 161.)

 In the context of state taxation, *Colville* concluded a state could distinguish between Indians residing on the lands of another tribe and those residing on their own tribal lands, and accord the same tax treatment to the former group as it accorded to non-Indians.

The *Colville* decision led most jurisdictions to reevaluate their reading of *McClanahan* as exempting all Indians residing on any tribal lands from state income taxation, and led them to conclude that Indians residing on the lands of another tribe were not exempt. In New Mexico, *Fox v. Bureau of Revenue, supra*, 87 N.M. 261 was explicitly overruled in *New Mexico Taxation and Revenue Dept. v. Greaves, supra*, 116 N.M. 508, 509. In Minnesota, that state's Supreme Court concluded its decision in *Topash* was no longer good law after *Colville* and other United States Supreme Court cases (see *State v. R.M.H.* (Minn. 2000) 617 N.W.2d 55, 63–64), and in Montana, *LaRoque v. State, supra*, 178 Mont. 315 was apparently superseded by statutory amendment. (See *LaRock, supra*, 241 Wis.2d at p. 100.) Two other states have examined *Colville*'s refinement of *McClanahan* and concluded a state may distinguish (at least for tax purposes) between Indians residing on the lands of another tribe and those residing on their own tribe's lands, and may deny tax-exempt status to the former even though the tax exemption would be available if the Indians resided on their tribe's lands from which the revenue

was generated.[7] (See *LaRock, supra*, 241 Wis.2d 87 [income tax]; *State ex rel. Arizona Dept. of Revenue v. Dillon* (1991) 170 Ariz. 560 [826 P.2d 1186] [luxury excise tax].)

### D. Duro[8] *and the "Duro Fix"*

The final significant piece of the decisional puzzle is *Duro*. There, the court again confirmed that a distinction exists between Indians on the lands of another tribe and tribal members on their own lands, albeit not in the context of state taxation, when the Supreme Court considered whether the Salt River Pima-Maricopa Indian Community (a recognized tribe with an enrolled membership) had criminal jurisdiction over Duro (an enrolled member of a different tribe) to prosecute him for his alleged crime on the Salt River Reservation. (*Duro, supra*, 495 U.S. 676.)

Analyzing the power of the Pima-Maricopa Tribe to prosecute Duro, the court reasoned that "the retained sovereignty of the tribes is that needed to control their own internal relations, and to preserve their own unique customs and social order" (*Duro, supra*, 495 U.S. at pp. 685–686), but this retained sovereignty to prosecute members of their own tribe was not implicated when an Indian (who could not participate in the tribal government) commits a crime on another tribe's lands. (*Id.* at p. 688.) In so deciding, the court restated that: "The distinction between members and nonmembers and its relation to self-governance is recognized in other areas of Indian law. Exemption from state taxation for residents of a reservation, for example, is determined by tribal membership, not by reference to Indians as a general class. We have held that States may not impose certain taxes on transactions of tribal members on the reservation because this would interfere with internal governance and self-determination. [Citations.] But this rationale does not apply to taxation of nonmembers, even where they are Indians: [¶] 'Nor would the imposition of Washington's tax on these purchasers contravene the principle of tribal self-government, for the simple reason that nonmembers are not constituents of the governing Tribe. For most practical purposes those Indians stand on the same footing as non-Indians resident on the reservation. There is no evidence that nonmembers have a say in tribal affairs or significantly share in tribal disbursements.' [Citation.]" (*Id.* at pp. 686–687.)

---

[7] We recognize some jurisdictions may provide Indians on the lands of another tribe with the same *McClanahan* tax-exempt status as tribal members on their own tribal lands. However, some of those jurisdictions provide statutory income tax exemptions for all American Indians on Indian lands within their borders (see Or. Rev. Stat. § 316.777 (2009)), while others have decisional law that applied *McClanahan* without the benefit of *Colville*. (See *White Eagle v. Dorgan, supra*, 209 N.W.2d 621.)

[8] *Duro v. Reina* (1990) 495 U.S. 676 [109 L.Ed.2d 693, 110 S.Ct. 2053] (*Duro*).

The *Duro* court also addressed the claim, raised by the Pima-Maricopa Tribe, that the tribe could assert jurisdiction because the definition of "Indian" in various federal statutes and programs applies to all Indians without respect to membership in a particular tribe, and that the federal jurisdictional statutes applicable to Indian country used the general term "Indian" without distinguishing between members and nonmember Indians. Rejecting that claim, *Duro* explained: "Congressional and administrative provisions such as those cited above reflect the Government's treatment of Indians as a single large class with respect to *federal* jurisdiction and programs. Those references are not dispositive of a question of *tribal* power to treat Indians by the same broad classification. In *Colville*, we noted the fallacy of reliance upon the fact that member and nonmember Indians may both be 'Indians' under a federal definition as proof of federal intent that inherent tribal power must affect them equally: [¶] '[T]he mere fact that nonmembers resident on the reservation come within the definition of "Indian" for purposes of the Indian Reorganization Act of 1934 [citations] does not demonstrate a congressional intent to exempt such Indians from State taxation.' [Citation.] [Quoting *Colville, supra*, 447 U.S. at p. 161.]" (*Duro, supra*, 495 U.S. at pp. 689–690.)

*Duro* reaffirmed the holding of *Colville* in determining that the sovereignty retained by Indian tribes does not include criminal jurisdiction over nonmember Indians, although it does include criminal jurisdiction over tribal members on their own tribal lands. (*Duro, supra*, 495 U.S. at p. 694.)

In *Duro*, the Pima-Maricopa Tribe also raised the concern that if the court did *not* grant it criminal jurisdiction over nonmember Indians on its tribal lands, "the tribes will lack important power to preserve order on the reservation, and nonmember Indians will be able to violate the law with impunity." (*Duro, supra*, 495 U.S. at p. 696.) The court responded to that concern by stating that "[i]f the present jurisdictional scheme proves insufficient to meet the practical needs of reservation law enforcement, then the proper body to address the problem is Congress, which has the ultimate authority over Indian affairs." (*Id.* at p. 698.) Congress did respond to the court's invitation by passing the so-called "Duro fix," which expressly specified that a tribe had criminal jurisdiction over nonmember Indians for a crime occurring on tribal lands. (See 25 U.S.C. § 1301(2).)

### III

### ANALYSIS

■ We interpret the mixture of *McClanahan* and *Colville*, with some leavening by *Duro*, as precluding Mike from an exemption from California's income taxation because an essential ingredient for the exemption—residence

on the lands set aside for the tribe in which she is a member and from which the income derived—is absent here.

*McClanahan* decided that income is not taxable when three factors coalesce: descent (Indian), residence (on the reservation of the taxpayer's tribe) and derivation (income from reservation activities). However, *McClanahan* simultaneously cautioned that it was not "dealing with Indians who have left . . . reservations set aside for their exclusive use . . . ." (*McClanahan, supra*, 411 U.S. at p. 167.) Additionally, it is reasonably clear from the other cases cited by *McClanahan* (see *id.* at pp. 167–169) that the absence of any *one* of these three factors can obviate the federal preemption of state taxation, and numerous other cases confirm that construction. (See, e.g., *Mescalero Apache Tribe v. Jones* (1973) 411 U.S. 145 [36 L.Ed.2d 114, 93 S.Ct. 1267] [derivation factor absent: state may tax revenues of reservation tribe members derived from off-reservation sources]; *Moe, supra*, 425 U.S. 463 [descent factor absent: state may tax revenues derived from on-reservation sales to non-Indians]; *Colville, supra*, 447 U.S. at p. 161 [residence factor absent: state may tax revenues derived from on-reservation sales to nonmember resident Indians].)

Moreover, both *Colville* and *Duro* confirm the special treatment accorded to reservation Indians does not arise merely because the individual generically satisfies the descent and residence factors. To the contrary, *Colville* approved distinguishing between, and according differential treatment in the tax realm to, Indians descended from the specific tribe on whose reservation land they resided and Indians not descended from the specific tribe on whose reservation land they resided, and concluded only the former were protected by preemption from the state's ability to tax them in the same manner as the state was entitled to tax non-Indians. Similarly, the court in *Duro*—relying in part on *Colville* (see *Duro, supra*, 495 U.S. at p. 687)—again distinguished between and accorded differential treatment in the criminal law realm to Indians descended from the specific tribe on whose reservation land the offense occurred and Indians not descended from the specific tribe on whose reservation land they committed the offense, and concluded only the former were subject to the tribe's jurisdiction.

Thus, while *Colville* reaffirmed the vitality of *McClanahan*'s analysis, it concluded tribal affiliation was significant for tax purposes and neither preemption principles nor sensitivity to tribal sovereignty concerns was implicated when a state sought to tax an Indian for taxable events occurring on the lands of a different tribe. Specifically addressing preemption concerns, *Colville* explained *McClanahan* would preclude a sales tax on purchases by tribal members but "[f]ederal statutes, even given the broadest reading to which they are reasonably susceptible, cannot be said to pre-empt Washington's power to impose its taxes on Indians not members of the Tribe. . . .

Similarly, the mere fact that nonmembers resident on the reservation come within the definition of 'Indian' for purposes of the Indian Reorganization Act of 1934 [citations] does not demonstrate a congressional intent to exempt such Indians from state taxation." (*Colville, supra,* 447 U.S. at pp. 160–161.) Addressing the tribal sovereignty concerns, *Colville* concluded taxation of nonmembers would not offend the "principle of tribal self-government, for the simple reason that nonmembers are not constituents of the governing Tribe. *For most practical purposes those Indians stand on the same footing as non-Indians resident on the reservation.*" (*Id.* at p. 161, italics added.)

It is clear that an Indian may not move away from the lands reserved for the exclusive use of the tribe in which he or she is enrolled and into the general population while nevertheless retaining the tax exemption for income afforded to that Indian under *McClanahan.* (See, e.g., *Oklahoma Tax Comm'n, supra,* 515 U.S. at pp. 462–467 [state may impose income tax on enrolled member for income earned from tribal employment if member resides outside of "Indian Country"]; *Jefferson v. Commissioner of Revenue* (Minn. 2001) 631 N.W.2d 391.) Moreover, after *Colville* and *Duro,* the courts appear unanimous in their conclusion that the same rule applies when an Indian moves away from the lands reserved for the exclusive use of the tribe in which he or she is enrolled even though the new residence might qualify as "Indian lands" for other purposes or other persons. (See, e.g., *LaRock, supra,* 241 Wis.2d at pp. 95–96.)

Mike raises numerous arguments to support her claim that loss of the *McClanahan* tax exemption, which ordinarily accompanies the decision to move away from the lands set aside for the taxpayer's tribe (*Oklahoma Tax Comm'n, supra,* 515 U.S. at pp. 462–467), may be resurrected or preserved if the taxpayer elects to establish a new residence on a reservation of a tribe in which the taxpayer is not enrolled rather than some other residence. We are unpersuaded by Mike's arguments.

First, Mike asserts that whatever distinctions that may have been drawn by *Colville* and *Duro* to accord differential treatment between members and nonmembers residing on a reservation were statutorily obviated by the "Duro fix." Mike asserts that because the federal statute amended by the "Duro fix" expressly gives tribal courts criminal jurisdiction over both member and nonmember Indians, the courts should disregard *Colville*'s distinction between member and nonmember Indians and instead hold that nonmember Indians residing on a reservation are entitled to be treated identically to members for tax purposes. Although some legal commentators have either questioned whether *Colville*'s distinction between member and nonmember Indians remains valid after the "Duro fix" (see, e.g., Cohen, Handbook of Federal Indian Law, *supra,* § 6.01[1], p. 499, fn. 5), or criticized post-"Duro

fix" state court decisions applying the *Colville* distinction to uphold state income taxation of nonmembers (see Nayback, *Tax Law—New Mexico Taxes Non-Member Indians Who Work on a Reservation: New Mexico Taxation and Revenue Department v. Greaves* (1995) 25 N.M. L.Rev. 129), the courts have rejected the argument that the Duro fix has application outside of criminal law or has impliedly overruled *Colville*. The court in *LaRock, supra,* 241 Wis.2d 87, explaining its rejection of the same claim as raised by Mike here, stated: "LaRock, by looking to committee reports and legislative history, argues that the 'Duro fix' not only overturned the United States Supreme Court's decision in *Duro*, but mandated that a state has no inherent jurisdiction over nonmember Indians within Indian country. LaRock's argument fails for three reasons. First, Congress did precisely what the Supreme Court invited it to do in *Duro*; there was no question that Congress was within its authority in passing such legislation. Although Congress granted 'Indian tribes' jurisdiction over Indians committing a crime on their tribal lands, it does not follow that Congress eliminated the distinction between Indian tribes. 25 U.S.C. § 1301(2). To the contrary, if Congress intended to erase this distinction, it could have done so explicitly in the legislation. Second, Congress has not acted to overturn *Colville*, which[,] unlike *Duro*, is within the context of the present case-state taxation. Of course, the Wisconsin Legislature could act to grant such an exemption, but so far has refrained from doing so, in contrast to the state legislatures in Oregon and Idaho. Finally, the Supreme Court, while indicating that it was cognizant of the 'Duro fix,' repeated the rule of its 'pathmaking case' of [*Montana v. United States* (1981) 450 U.S. 544, 564 [67 L.Ed.2d 493, 101 S.Ct. 1245]], which defined the limits of tribal sovereignty: 'Indian tribes retain their inherent power [to punish tribal offenders,] to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members . . . but [a tribe's inherent power does not reach] beyond what is necessary to protect tribal self-government or to control internal relations.' [Quoting *Strate v. A-1 Contractors* (1997) 520 U.S. 438, 459 [137 L.Ed.2d 661, 117 S.Ct. 1404] (bracketed material provided by *Strate*)]. The Court, as evidenced by this recent reiteration of the *Montana* rule in a case fourteen years after the 'Duro fix,' has held since *McClanahan* that membership in a tribe, not ethnic status as an American Indian, is the integral fact that brings inherent tribal sovereignty into play. Thus, the distinction between nonmember Indians on the lands of another tribe and tribal members on their own lands—as stressed in *Colville* and reasserted in *Duro*—remains valid." (*LaRock*, at pp. 102–104.)

We agree with *LaRock* that Mike's expansive reading of the "Duro fix," which seeks to read into an amendment expressly addressing a limited issue (criminal law jurisdictional issues) an implied congressional intent indirectly to overrule civil law decisions concerning a state's ability to distinguish

between member and nonmember Indians for different issues (e.g., tax law issues), is too speculative to convince us that *Colville* lacks remaining vitality.[9]

Mike alternatively asserts that, even without the impact of the "Duro fix," a nonmember is entitled to the *McClanahan* exemption.[10] Mike argues *McClanahan* did not express any intent to exclude nonmembers from its holding, but instead extended the tax exemption to " 'tribal Indians on an Indian reservation' " (*McClanahan, supra*, 411 U.S. at pp. 170–171) without suggesting tribal affiliation was significant. Mike argues the courts have simply erred when they overlaid the analysis of *Colville* onto whether the *McClanahan* exemption was available. Although *McClanahan* employed the term "reservation Indians" to describe the class of persons exempt from Arizona's income tax (*id.* at p. 176), the factual context presented in *McClanahan* did not require the court further to refine that term or to consider distinctions between members and nonmembers, because its preemption analysis was conducted in the context of treaties involving the tribe (the Navajo) in which the taxpayer was both enrolled and on whose reservation he resided.[11] However, when the Supreme Court *was* presented with the issue of

---

[9] For similar reasons, we reject Mike's argument that ordinary principles of statutory construction, as well as the special canon of construction that doubtful expressions of statutory language are to be resolved in favor of Indians (*McClanahan, supra*, 411 U.S. at p. 174), should lead us to construe title 18 United States Code section 1151's reference to "Indian country" as evidencing an intent that any lands set aside for the exclusive use of Indians *without regard to tribal membership* qualify the Indian for the *McClanahan* tax exemption. Those *principles of statutory construction have little utility because* (1) the tax exemption is not a statutorily rooted exemption, and (2) the broad concept of "Indian country" described in title 18 United States Code section 1151 is not part of the complex statutory scheme in the taxation sphere, but is instead part of the federal criminal code and had as its "purpose . . . to remove the uncertainty of federal jurisdiction over crimes committed by or against Indians within the exterior boundaries of an Indian reservation." (*Hilderbrand v. Taylor* (10th Cir. 1964) 327 F.2d 205, 206.)

[10] Mike has requested this court take judicial notice of certain portions of a pamphlet issued by California's State Board of Equalization involving sales taxes on reservation lands. We conclude the evidence is irrelevant to the issues presented here, because California's *choices* in imposing sales taxes do not suggest that it was *compelled* to make those choices. Accordingly, we deny Mike's request for judicial notice. (See, e.g., *World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561, 1569, fn. 7 [92 Cal.Rptr.3d 227].)

[11] For similar reasons, Mike's reliance on *Sac and Fox* is also not persuasive. Mike argues the *Sac and Fox* court held that the *McClanahan* exemption applies to all Indians residing within Indian country, regardless of tribal membership. However, the *Sac and Fox* court evaluated a claim brought by the Sac and Fox Nation on behalf of itself and "all residents of its territorial jurisdiction." (*Sac and Fox, supra*, 508 U.S. at p. 120.) Both the trial court and the appellate court, which both held the state could collect state income tax on the income nonmembers of the Tribe earned from tribal employment on trust lands, but not on the income tribal members earned from tribal employment on trust lands, reached their conclusions without looking "to where the tribal members resided" but instead examined only the source of the income. (*Id.* at pp. 121–122.) The state argued the lower courts had erred because "unless

taxation of nonmembers, the *Colville* court *did* predicate its preemption analysis with reference to the distinction between resident nonmembers and resident members,[12] and ultimately concluded that while members could not be taxed, "[f]ederal statutes, even given the broadest reading to which they are reasonably susceptible, cannot be said to pre-empt Washington's power to impose its taxes on Indians not members of the Tribe." (*Colville, supra*, 447 U.S. at p. 160.)

■ Mike next raises a series of arguments that essentially assert tribal membership is, or should be deemed, irrelevant for taxation purposes. She argues "tribes" are artificial and arbitrary constructs created when the federal government melded disparate groups together (or divided cohesive groups into separate groups) and designated the resulting grouping as a distinct political entity, regardless of whether the members in the newly created "tribe" shared tribal, familial, or genetic commonality. She argues the evidence below demonstrated the Tribe and the Agua Caliente Band exemplify the artificial nature of tribal structure under federal law, because these groups are not distinct groups but instead share a common history, lineage and moiety, and therefore the courts should disregard the tribal distinction between Mike's Tribe and the Agua Caliente Band.[13] However, we may not

---

the members of the Sac and Fox Nation live on a *reservation* the State has jurisdiction to tax their earnings . . . ." (*Id.* at p. 123.) The Supreme Court concluded that the state was "partially correct: The residence of a *tribal member* is a significant component of the *McClanahan* presumption against state tax jurisdiction. But our cases make clear that *a tribal member* need not live on a formal reservation to be outside the State's taxing jurisdiction; it is enough that the *member* live in 'Indian country' " (*ibid.*, italics added), and remanded the case to the trial court to determine whether "the relevant tribal members live in Indian country—whether the land is within reservation boundaries, on allotted lands, or in dependent communities." (*Id.* at p. 126.) The court's repeated references to tribal membership suggest it had no intent to disturb the lower court's ruling that the state could collect state income tax on the income nonmembers of the tribe earned, which persuades us that *Sac and Fox* has no relevance to the taxation of nonmembers.

[12] *Colville*'s tribal sovereignty discussion also highlighted the distinction between resident nonmembers and resident members, noting that permitting a state tax on nonmembers would not contravene the principle of tribal self-government "for the simple reason that nonmembers are not constituents of the governing Tribe. For most practical purposes those [nonmember resident] Indians stand on the same footing as non-Indians resident on the reservation." (*Colville, supra*, 447 U.S. at p. 161.)

[13] Mike does not explain how the underlying basis for the *McClanahan* exemption may coexist with her claim that the federal approach on how to divide or amalgamate groups into tribal units should be disregarded. It appears federal recognition of a tribe is the predicate to confirming the tribe's existence as a distinct political society with whom government-to-government relationships could be established between the federal government and tribal units, which in turn creates concomitant limitations on the state's authority over those tribes. (See generally Cohen, Handbook of Federal Indian Law, *supra*, § 3.02[1]–[4], pp. 135–143.) Because *McClanahan*'s exemption is conceptually rooted in the twin concepts of federal preemption (arising out of the treaties and statutes governing the government-to-government relationships between the federal and tribal governments) and tribal sovereignty, Mike's

disregard *Colville*'s clear instruction that tribal affiliation and membership *do* matter in determining the circumstances under which the state may levy and collect taxes for persons residing on a reservation. Mike's argument appears to constitute a sub silentio invitation for this court to disregard that she is an enrolled member of the Tribe, and to also make her a *de facto* member of the Agua Caliente Band. That determination is beyond this court's power. (See generally *Smith v. Babbitt* (8th Cir. 1996) 100 F.3d 556, 558–559 [court lacked jurisdiction over dispute involving alleged improper distribution of gaming proceeds to allegedly ineligible persons because " '[a] tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community.' [Citation.] Essentially, therefore, a membership dispute is an issue for a tribe and its courts."].)

Finally, Mike argues the tax is discriminatory because her Tribe's reservation lands are small compared to those of other tribes and it is impossible for her to reside on her Tribe's reservation because neither the Tribe nor Mike has elected to spend any of the gaming revenues to build housing on its reservation. Assuming Mike intends this argument as a challenge to the income tax on equal protection grounds,[14] we are convinced there is a rational basis (*County of Los Angeles v. Patrick* (1992) 11 Cal.App.4th 1246, 1252 [14 Cal.Rptr.2d 665]) for treating Indians who have left their own tribe's reservation like all other taxpayers in California, because "[f]or most practical purposes those Indians stand on the same footing as non-Indians resident on the reservation." (*Colville, supra,* 447 U.S. at p. 161.) Mike cites no authority suggesting her *reasons* for changing her residence render an otherwise proper tax a violation of equal protection (cf. *Jefferson v. Commissioner of Revenue, supra,* 631 N.W.2d at pp. 395–397 & fn. 4 [rejecting equal protection challenge to propriety of taxing Indians who left reservation and concluding their reasons for leaving reservation were irrelevant to analysis]), and we are not persuaded by this argument.

---

argument (that a court should disregard the boundaries of federally recognized tribes) would appear to erode the underpinnings of the *McClanahan* exemption.

[14] Mike's argument, made without citation to relevant authority, does not identify the appropriate level of scrutiny to apply: whether the test is the deferential "rational basis" level of scrutiny (see, e.g., *Minnesota v. Clover Leaf Creamery Co.* (1981) 449 U.S. 456, 464 [66 L.Ed.2d 659, 101 S.Ct. 715]), the so-called "intermediate scrutiny" approach (see, e.g., *Hodgkins ex rel. Hodgkins v. Peterson* (7th Cir. 2004) 355 F.3d 1048, 1057), or whether "strict scrutiny" applies (see, e.g., *Nunez by Nunez v. City of San Diego* (9th Cir. 1997) 114 F.3d 935, 946). Indeed, it does not appear Mike even raised this claim below. Both defects would permit this court to deem the claim waived. (See, e.g., *Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 879 [242 Cal.Rptr. 184] [waiver of claims not raised at trial]; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 [79 Cal.Rptr.3d 588] [waiver of claims unsupported by authority].)

## DISPOSITION

The judgment is affirmed.

Benke, Acting P. J., and Huffman, J., concurred.