Filed 9/25/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE ex rel. XAVIER BECERRA, as Attorney General, etc., <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> ARDITH HUBER, <br><br>     Defendant and Appellant. | A144214 <br><br> (Humboldt County <br> Super. Ct. No. DR110232) |

## I.    INTRODUCTION

This appeal is from a summary adjudication order and permanent injunction entered in an enforcement action by the Attorney General on behalf of the People of the State of California against Ardith Huber, a member of the Wiyot Band of Indians. Huber owns and operates a tobacco smokeshop on the Table Bluff Rancheria, an area where the Wiyots live just outside of Crescent City, in Humboldt County.

The Attorney General's complaint alleges a claim for violation of the Unfair Competition Law, Business and Professions Code section 17200 et sequitur (the UCL) and cites as predicate "unlawful acts" violations of three statutes applicable to cigarette sales and marketing, the Tax Stamp Act (Rev. & Tax. Code, § 30161), the Directory Act (Rev. & Tax. Code, § 30165.1, subd. (e)(2)), and the Fire Safety Act (Health & Saf. Code, § 14951, subd. (a)). He also pleads, as separate claims, violations of the Directory

1

Act and the Fire Safety Act. The trial court granted summary adjudication to the to the People, denied it to Huber, and entered a permanent injunction on all three claims.

Huber's primary argument on appeal is an attack on subject matter jurisdiction. She contends that, under a federal statute granting California courts plenary criminal jurisdiction but limited civil jurisdiction over cases arising on Indian reservations, the trial court lacked power to proceed on any of the three claims in this case. She also argues that, under the doctrine of Indian preemption, which limits the reach of state law to conduct by Indians on Indian reservations, all the statutes the Attorney General seeks to enforce here are preempted by paramount federal authority.

We reverse in part, agreeing the court lacked subject matter jurisdiction to proceed on the UCL claim, but in all other respects affirm.

## II. BACKGROUND

A. *Huber Enterprises and the Table Bluff Rancheria*

Huber runs a sole proprietorship out of her home called Huber Enterprises, selling cigarettes at retail and wholesale. Although Huber once sold other brands of cigarettes, after 2007 she has sold exclusively Native American brands, which she describes as "cigarettes manufactured by Indians on Indian lands, . . . shipped and sold through Indian and tribally-owned distributors to Indian and tribally-owned retail smokeshops located on Indian lands."

The retail component of Huber's enterprise is onsite business. Customers include tribe members and nonmembers who come to the Table Bluff Rancheria to make purchases there. The wholesale component of the enterprise is with "over two dozen Indian smokeshops owned either by Indian tribes or [i]ndividual tribal members and operated within [other] . . . recognized Indian reservation[s]." Deliveries are made to these "inter-tribal" customers by truck, using California highways.

Huber Enterprises is licensed to do business pursuant to the Wiyot Tribal Business Code and the Wiyot Tribal Tobacco Licensing Ordinance (Ordinance No. 01-10). Ordinance No. 01-10 was promulgated June 14, 2010, for purposes of, inter alia, "promot[ing] tribal economic development," "regulat[ing] and licens[ing] the

2

manufacture, distribution, wholesaling, and retailing of tobacco products," "complement[ing] and enforc[ing] federal standards relating to or prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of, and use of tobacco products," and "encourag[ing] and foster[ing] traditions and culture of the Tribe."

Ordinance No. 01-10 requires licensees to pay—and Huber Enterprises does pay—a quarterly excise tax administered through a tribal tax stamp system. Taxes collected in this manner are deposited into a dedicated Tribal Tobacco Fund, earmarked solely for the expenses of "[t]obacco-related school and community health education programs," "[s]moking and tobacco-use prevention measures," and "[a]ssistance to tribal and community members for cessation of smoking and tobacco use."

There is no dispute in this case that today the Wiyot Band of Indians is a federally recognized tribe and that the Table Bluff Rancheria falls within the broad definition of "Indian country" under federal law, as do individual allotments of land to enrolled tribe members such as Huber. (18 U.S.C. § 1151; see *Oklahoma Tax Com. v. Sac & Fox Nation* (1993) 508 U.S. 114, 123 ["Indian country" encompasses "formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States"].)[1]

---

[1] Federally protected territory in California falling within the federal definition of "Indian country" has a unique history that differs in some respects from the history of federally protected Indian lands in other states, where in many cases treaties with tribes determined the boundaries of tribal territory. (See Cohen, Handbook of Federal Indian Law (2012 ed.) § 3.04[2][a], p. 185 (Cohen).) Early in the 20th century, the United States sought to improve "the landless, homeless or penurious state of many California Indians" by purchasing numerous small tracts of land known as " '[r]ancherias.' " (*Williams v. Gover* (9th Cir. 2007) 490 F.3d 785, 787.) The United States holds these rancheria lands in trust for resident Indians, controlling the land pursuant to a "special fiduciary duty owed by the United States to the Indian people." (*Table Bluff Band of Indians v. Andrus* (N.D.Cal. 1981) 532 F.Supp. 255, 258.) A federal statute passed in 1958 known as the California Rancheria Act (Pub.L. No. 85-671 (Aug. 18, 1958) 72 Stat. 619-621), amended in 1964 (Pub.L. No. 88-419 (Aug. 11, 1964) 78 Stat. 390-391) (the

*B.*     *The Directory Act, the Fire Safety Act, and the Tax Stamp Act*

At the center of the appeal are three sets of statutes governing different aspects of the sale and distribution of cigarettes in California. In order to provide some general legal context and set the stage for the specific issues framed by the appeal, we begin by summarizing these statutes.

First, California, along with many other states, has enacted legislation designed to implement the provisions of the 1998 Tobacco Master Settlement Agreement (the MSA).[2] Under the pertinent California statutes, cigarettes sold in this state must be produced by manufacturers who either (a) have signed the MSA and agreed to pay substantial sums to the state to cover, among other things, health care costs generated by tobacco use among Californians, or (b) in lieu of signing the MSA, have agreed to pay sufficient funds into a reserve fund in escrow to guarantee a source of compensation should liability arise. (Health & Saf. Code, §§ 104555-104557.) Under the Directory Act, the Attorney General maintains a published list of all cigarette manufacturers who have annually certified their compliance with the requirements of the MSA or the alternative escrow funding requirements. (Rev. & Tax. Code, § 30165.1, subds. (c) & (d).) It is categorically illegal for any "person" to "sell, offer, or possess for sale in this state, ship or otherwise distribute into or within this state" cigarettes that are not in

Rancheria Act) established a process for terminating the trust relationship between the United States and the Indian people residing on 41 enumerated California rancherias and reservations. (*Table Bluff,* at p. 258.) A plan of termination for the Table Bluff Rancheria was prepared under the Rancheria Act, but because federal authorities failed to carry out various prerequisites to termination, the plan never took effect. (*Id.* at p. 259.) Throughout this opinion, we will occasionally use the term "reservation," equating it with rancheria, since there is no dispute that the Table Bluff Rancheria qualifies as "Indian country," and since many of the pertinent United States Supreme Court cases arose in states where tribes live on reservations.

[2] See Annotation, Validity, Construction, Application, and Effect of Master Settlement Agreement (MSA) Between Tobacco Companies and Various States, and State Statutes Implementing Agreement; Use and Distribution of MSA Proceeds (2007) 25 A.L.R.6th 435, section 2 (summarizing mechanics of MSA and state statutes implementing its provisions).

compliance with the Directory Act. (*Id.,* § 30165.1, subd. (e)(2); see Health & Saf. Code, § 104555.)

Second, under the Fire Safety Act, any manufacturer of cigarettes sold in California must meet specified testing, performance, and packaging standards established for the purpose of minimizing the fire hazards caused by cigarettes. (Health & Saf. Code, §§ 14951, subd. (a)(1)-(3), 14952-14954.) This statute provides that all cigarettes sold in this state must, among other things, be packaged in a specified manner and certified with the State Fire Marshal as compliant with these safety standards. (*Id.*, § 14951, subd. (a).) It is categorically illegal for any "person" to "sell, offer, or possess for sale in this state cigarettes" that do not comply with the Fire Safety Act. (*Ibid.*)

Third, to reduce smoking and fund healthcare research related to diseases caused by smoking (Rev. & Tax. Code, §§ 30131 & 30121 et seq.), California imposes excise taxes that "shall be paid by the user or consumer" (*id.,* § 30107) but that must be collected by distributors at the time of sale and remitted by them to the state (*id.,* § 30108). Compliance with this remittance obligation is administered under the Tax Stamp Act, which requires all cigarette packages sold in California to have tax stamps affixed to them. (Rev. & Tax. Code, § 30161.) Subject to exceptions, it is illegal for any "person" to "knowingly possess[], or keep[], store[], or retain[] for the purpose of sale, or sell[] or offer[] to sell, any package of cigarettes to which there is not affixed" a tax stamp required by the Tax Stamp Act. (Rev. & Tax. Code, § 30474, subd. (a).)

C.      *Procedural History*

After sending two cease-and-desist letters charging Huber with violating various provisions of state law governing distribution and sales of cigarettes, the Attorney General filed this action in Humboldt County in March 2011. The complaint pleaded three causes of action. The first alleged violation of the Directory Act. The second alleged violation of the Fire Safety Act. And the third alleged violation of the UCL, specifying violations of the Tax Stamp Act, the Directory Act, and the Fire Safety Act as predicate "unlawful acts" warranting entry of a permanent injunction and an award of civil penalties.

5

Specifically, it was alleged that Huber Enterprises sold cigarettes in packages without an affixed tax stamp and failed to collect and remit excise taxes, all in violation of the Tax Stamp Act (Rev. & Tax. Code, § 30161); sold cigarettes purchased from manufacturers not listed by the Attorney General on the statewide tobacco directory, in violation of the Directory Act (*id*, § 30165.1, subd. (e)(2)); and sold cigarettes in packaging that does not meet required safety standards, in violation of the Fire Safety Act (Health & Saf. Code, § 14951, subd. (a)).[3]

On cross motions for summary adjudication, the trial court denied Huber's motion; granted the Attorney General's motion in part, leaving open triable issues concerning civil penalties; and entered a permanent injunction. By its terms, the injunction applies only to sales to nonmembers of the Wiyot Tribe and permits Huber to continue operating so long as she complies with the Directory Act, the Fire Safety Act, and the Tax Stamp Act. This appeal followed.

### III. DISCUSSION

Only the grant of the permanent injunction is on appeal. " 'A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action . . . against a defendant and that equitable relief is appropriate. A permanent injunction . . . is a final judgment on the merits.' " (*Dawson v. East Side Union High School Dist.* (1994) 28 Cal.App.4th 998, 1041.) Normally, "[t]he trial court's decision to grant a permanent injunction rests within its sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion." (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912.) But where an appeal attacks the legal premises of a permanent injunction on undisputed ultimate facts—as is the case here—our review is de novo. (*Dawson,* at p. 1041.)

Because the order granting summary adjudication in favor of the Attorney General and denying it to Huber supplies the basis for the permanent injunction, we must in turn

---

[3] There is no standalone cause of action for violation of the Tax Stamp Act.

review whether summary adjudication was correctly granted as to each of the three causes of action.  We review de novo an order granting summary judgment or summary adjudication.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860.)  "As a practical matter, ' "we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment." ' " (*Swigart v. Bruno* (2017) 13 Cal.App.5th 529, 536.)  A summary adjudication motion "proceed[s] in all procedural respects as a motion for summary judgment." (Code Civ. Proc., § 437c, subd. (f)(2).)

A.     *Subject Matter Jurisdiction*

The United States Supreme Court "first addressed the sovereign status of [Indian] tribes in three opinions known today as the Marshall Trilogy after their author, Chief Justice John Marshall.  (See *Worcester v. The State of Georgia* (1832) 31 U.S. 515 . . . ; *Cherokee Nation v. Georgia* (1831) 30 U.S. 1 . . . (*Cherokee Nation*); *Johnson v. M'Intosh* (1823) 21 U.S. 543 . . . .)  Broadly speaking, these cases established that 'states lack jurisdiction in Indian country, that tribes are "domestic dependent nations" to whom the United States owes a fiduciary obligation, and that Indian affairs are the exclusive province of the federal government.' " (*People v. Miami Nation Enterprises* (2016) 2 Cal.5th 222, 233-234.)  Within this dependency relationship as Chief Justice Marshall conceived of it, relations between tribes and individual states are governed exclusively by the United States, and thus, absent express congressional authorization by treaty or legislation, state law does not extend to Indian territory.  (See *Worcester v. The State of Georgia, supra,* 31 U.S. at p. 561.)  From this basic principle evolved a closely related corollary—that absent congressional authorization, state courts lack subject matter jurisdiction to adjudicate cases arising on Indian lands.  (See *Williams v. United States* (1946) 327 U.S. 711, 714 & fn. 10 [criminal jurisdiction]; *Williams v. Lee* (1959) 358 U.S. 217, 220, 222-223 (*Williams*) [civil jurisdiction].)

Huber's main contention here is that California courts have no subject matter jurisdiction over this case because it involves her on-reservation activities as a member of the Wiyot Tribe.  Central to her argument is a federal statute known as Public Law 280

7

(Pub.L. No. 83-280 (Aug. 15, 1953) 67 Stat. 588-590) by which Congress granted six states, one of which is California, plenary criminal jurisdiction over "offenses committed by or against Indians" within Indian country (18 U.S.C. § 1162(a); see *People v. McCovey* (1980) 36 Cal.3d 517, 535) and limited civil jurisdiction over "causes of action between Indians or to which Indians are parties" in cases arising in Indian country (28 U.S.C. § 1360(a); see *Boisclair v. Superior Court* (1990) 51 Cal.3d 1140, 1147, fn. 4 (*Boisclair*); *People ex rel. Dept. of Transportation v. Naegele Outdoor Advertising Co.* (1985) 38 Cal.3d 509, 520 (*Naegele*); *Middletown Rancheria v. Workers' Compensation Appeals Board* (1998) 60 Cal.App.4th 1340, 1348 (*Middletown Rancheria*)).[4]

---

[4] Section 4 of Public Law 280, 28 U.S.C. § 1360, provides as follows

"(a) Each of the States listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State:

*"State of                                    Indian country affected*

[¶ . . . ¶]

California………………………...…All Indian country within the State.

[¶ . . . ¶]

"(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the state to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

"(c) Any tribal ordinance or custom heretofore or hereafter adopted by an Indian tribe, band, or community in the exercise of any authority which it may possess shall, if not inconsistent with any applicable civil law of the State, be given full force and effect in the determination of civil causes of action pursuant to this section."

"Although the federal government has plenary power over tribal affairs" under the doctrine of Indian sovereignty, "it began to delegate some of this authority to the states in the early 1950's during an assimilationist period." (*Middletown Rancheria, supra,* 60 Cal.App.4th at p. 1348.) Public Law 280 is the principal statute under which that delegation took place. "The primary focus of the legislative history of Public Law 280 is on the grant of criminal jurisdiction set forth in section 2 (codified in 18 U.S.C. § 1162)." (*Middletown Rancheria, supra,* at p. 1348.) The civil grant of jurisdiction, set forth in section 4 of Public Law 280 (codified in 28 U.S.C. § 1360), by contrast, received relatively little attention in the legislative process, which prompted "one commentator to conclude that such jurisdiction was 'an afterthought . . . added because it comported with the pro-assimilationist drift of federal policy.' " (*Boisclair, supra,* 51 Cal.3d at p. 1150, quoting Goldberg*, Public Law 280: The Limits of State Jurisdiction Over Reservation Indians* (1975) 22 U.C.L.A. L.Rev. 535, 543 (Goldberg).)

At the time Congress passed Public Law 280 in 1953, the policy of the federal government tended to favor assimilation of Indian tribes into the surrounding citizenry of their respective states. (See Cohen, *supra,* §§ 1.06-1.07, pp. 89-99.)[5] Although there is nothing definitive in the legislative history to shed light on Congressional intent, "[w]hat is known is that Public Law number 280 passed despite considerable opposition from

Besides California, the other listed Public Law 280 states, as the statute was originally enacted in 1953, were Minnesota, Nebraska, Oregon, and Wisconsin. Alaska was added by Act of August 8, 1958, Public Law No. 85-615, section 1, 72 Statutes 545 (codified at 18 U.S.C. § 1162(a), 28 U.S.C. § 1360(a)). These six states are sometimes known as "mandatory" Public Law 280 states. (See Cohen, *supra,* § 6.04[3][a], p. 538, fn. 50.) Public Law 280 offered the option to other states to accept the same jurisdiction, and eventually 10 additional states, sometimes known as "optional" Public Law 280 states (Arizona, Idaho, Florida, Iowa, Montana, Nevada, North Dakota, South Dakota, Utah, and Washington), accepted jurisdiction under its terms, in whole or in part. (See Cohen, *supra*, § 6.04[3][a], pp. 537-538 & fn. 47.)

[5] Up to that point in time, federal policy had oscillated between periods of promotion of tribal assimilation and promotion of tribal self-determination. (*See Organized Village of Kake v. Egan* (1962) 369 U.S. 60, 74 (*Village of Kake*); *Boisclair, supra,* 51 Cal.3d at p. 1150.)

9

Indian organizations, which feared 'state jurisdiction would in practice operate to the disadvantage of the Indians. The Indians in many instances preferred federal to state jurisdiction because the [Bureau of Indian Affairs], for all its faults, at least perceived the Indians as its special responsibility and concern.' (Goldberg, *supra,* 22 U.C.L.A. L.Rev. at p. 545.) Perhaps because of this opposition, Public Law number 280, in its final form, represented 'an attempt at compromise between wholly abandoning the Indians to the states and maintaining them as federally protected wards, subject only to federal or tribal jurisdiction.' (*Id*. at p. 537.)" (*Boisclair*, *supra*, 51 Cal.3d at p. 1150.)

In line with this view of Public Law 280 as a compromise measure, Huber stakes her position on the premise that the United States Supreme Court has read the extension of civil jurisdiction under Public Law 280 narrowly, confining it to "private civil litigation involving reservation Indians in state court" (*Bryan v. Itasca County* (1976) 426 U.S. 373, 385 (*Bryan*)) while withholding "general state civil regulatory control over Indian reservations." (*Id.* at p. 384.) In *California v. Cabazon Band of Mission Indians* (1987) 480 U.S. 202 (*Cabazon*), which applies and expounds upon the holding in *Bryan*, the high court drew a distinction between " 'criminal/prohibitory' " actions (which are authorized by Public Law 280), and " 'civil/regulatory' " actions (which are not authorized by Public Law 280), leaving to lower courts the task of fleshing out this distinction in case-by-case adjudication. (*Cabazon,* at p. 209.) According to Huber, a public enforcement action under Business and Professions Code section 17200—by definition not a private dispute and seeking to force a change in her business operations through the coercion of an injunction and civil penalties—is an exercise of "general regulatory" power. We agree.

B.      *Public Law 280:  Civil Jurisdiction*

1.      Public Law 280, Section 4, as Construed in *Bryan*

Because *Bryan* is pivotal to our analysis of subject matter jurisdiction, we begin with a close look at that case. *Bryan*, decided three years after *McClanahan v. State Tax Commission of Arizona* (1973) 411 U.S. 164 (*McClanahan*), "the 'seminal case in the area of American Indian income taxation' [citation]" (*Mike v. Franchise Tax Bd.* (2010)

10

182 Cal.App.4th 817, 822), addressed a "question reserved in [*McClanahan*]: whether the grant of civil jurisdiction to the states conferred by § 4 of Pub.L. 280 . . . is a congressional grant of power to the states to tax reservation Indians except insofar as taxation is expressly excluded by the terms of the statute." (*Bryan*, *supra*, 426 U.S. at p. 375.) As summarized by the *Bryan* court, *McClanahan* established the baseline rule, restating and clarifying authority going back to the Marshall Trilogy, that states are "disabled in the absence of congressional consent from imposing a state income tax on the income of a reservation Indian earned solely on the reservation." (*Bryan,* at p. 377.)[6]

At issue in *Bryan* was a $147.95 personal property tax imposed by a Minnesota county on a mobile home owned by an enrolled member of the Chippewa tribe and located on a reservation. (*Bryan*, *supra*, 426 U.S. at p. 375.) The Supreme Court of Minnesota sustained the tax, holding that section 4(a) of Public Law 280 (28 U.S.C. § 1360(a)) grants a general power to tax. (*Bryan,* at pp. 375, 378.) Its analysis turned on section 4(b) of Public Law 280 (28 U.S.C. § 1360(b)), which lists a series of exceptions to the grant of power in section 4(a). (*Bryan*, at pp. 378-379.) " '[U]nless paragraph (a) is interpreted as a general grant of the power to tax, then the exceptions contained in

_____

[6] "The *McClanahan* principle derives from a general preemption analysis [citation] that gives effect to the plenary and exclusive power of the Federal Government to deal with Indian tribes [citations] and 'to regulate and protect the Indians and the property against interference even by a state,' [citation]. This pre-emption analysis draws support from 'the "backdrop" of the Indian sovereignty doctrine,' [citation] ' "[t]he policy of leaving Indians free from state jurisdiction and control [which] is deeply rooted in the Nation's history," ' [citation] and the extensive federal legislative and administrative regulation of Indian tribes and reservations, [citation]. 'Congress has . . . acted consistently upon the assumption that the States have no power to regulate the affairs of Indians on a reservation,' [citation], and therefore ' "State laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply." ' [Citation.] [¶] [T]his pre-emption model usually yields different conclusions as to the application of state laws to tribal Indians who have left or never inhabited federally established reservations, or Indians 'who do not possess the usual accoutrements of tribal self-government.' [Citations.]" (*Bryan*, *supra,* 426 U.S. at p. 376, fn. 2.)

11

paragraph (b) are limitations on a nonexistent power,' " the state high court held. (*Bryan*, at p. 378.) Reversing, the United States Supreme Court rejected the idea that section 4(b) confirms a generalized grant of taxing power; the court instead interpreted section 4(a) as having a wholly different purpose, one involving courts and civil justice. Section 4(a) must be read as a grant of *judicial* power over "civil causes of action" the court held. (*Bryan,* at pp. 383-385.)

Invoking the interpretive canon that " 'statutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians' " (*Bryan*, *supra*, 426 U.S. at p. 392), and reading the text of section 4 in light of its "sparse" legislative history (*id.* at pp. 383-384), the court explained that "subsection (a) seems to have been primarily intended to redress the lack of adequate Indian forums for resolving private legal disputes between reservation Indians, and between Indians and other private citizens, by permitting the courts of the states to decide such disputes." (*Id.* at p. 383.) "[T]he consistent and exclusive use of the terms 'civil causes of action,' '[arising] on,' 'civil laws . . . of general application to private persons or private property,' and '[adjudication],' in both the Act and its legislative history virtually compels our conclusion that the primary intent of § 4 was to grant jurisdiction over private civil litigation involving reservation Indians in state court." (*Id.* at pp. 384-385; see also *Cabazon*, *supra*, 480 U.S. at p. 208 ["when a State seeks to enforce a law within an Indian reservation under the authority of Pub.L. 280, it must be determined whether the law is . . . civil in nature, and applicable only as it may be relevant to private civil litigation in state court"].)

Under the holding in *Bryan*, the power Congress withheld from states in the civil arena ("general state civil regulatory control") is just as important to bear in mind as the power it affirmatively granted (adjudicative authority over "private legal disputes" involving "reservation Indians"). (See *Bryan*, *supra*, 426 U.S. at pp. 383-384.) According to the *Bryan* court, Public Law 280 "was plainly not meant to effect [the] total assimilation" of tribes into the legal regimes in Public Law 280 states. (*Bryan*, at pp. 387-388.) The statute "was only one of many types of assimilationist legislation

12

under active consideration in 1953.  [Citations.]  And nothing in its legislative history remotely suggests that Congress meant the Act's extension of civil jurisdiction to the States should result in the undermining or destruction of such tribal governments as did exist and a conversion of the affected tribes into little more than ' "private, voluntary organizations," ' [citation]—a possible result if tribal governments and reservation Indians were subordinated to the full panoply of civil regulatory powers . . . of state and local governments."  (*Bryan,* at p. 387.)

Turning to the application of Public Law 280 section 4(a) in this case, we have a lawsuit in which one party is a member of a federally recognized tribe, and each of the statutes at issue, the Directory Act, the Fire Safety Act, the Tax Stamp Act, and the UCL, is a law of "general application to private persons" in California.  Accordingly, under one reading of the statutory language, the case would appear to fit easily within the statutory grant of civil jurisdiction for all three causes of action.  But that is not the reading the United States Supreme Court has adopted; *Bryan* instructs us that what matters here is the absence of any private dispute.  (See *Doe v. Mann* (9th Cir. 2005) 415 F.3d 1038, 1058-1059 (*Doe*) [under *Cabazon* and *Bryan* "the private nature of disputes is what places them within Public Law 280's civil jurisdiction"].)[7]  Because the Attorney General sues

---

[7]  The question of Public Law 280 jurisdiction arose in *Doe*, *supra*, 415 F.3d 1038 in a procedural posture that differs significantly from this case, but the opinion there is nonetheless instructive.  *Doe* was a federal action under the Indian Child Welfare Act (ICWA) in which an Indian mother whose parental rights had been terminated by the Lake County Superior Court sought declaratory and injunctive relief in an effort to invalidate the Lake County dependency judgment.  (*Doe,* at pp. 1047-1049, 1058-1059.)  The mother argued the dependency court lacked subject matter jurisdiction because she was a member of a federally recognized tribe, and her child had been removed from a home on the tribal reservation.  (*Id.* at pp. 1040-1041.)  In such a case, she argued, Indian tribes have exclusive jurisdiction under ICWA.  (*Id.* at p. 1041.)  A premise of that argument was that California dependency courts have no Public Law 280 jurisdiction because dependency proceedings, which are initiated and pursued by county social welfare agencies, do not involve "private disputes."  (*Id.* at pp. 1047-1049, 1058-1059.)

The Ninth Circuit panel opined that, even though the state is a party to dependency proceedings, those proceedings concern the "status" of "a private individual," and thus

13

with the manifest purpose of law enforcement on behalf of the public at large, and because this case is not one in which we may fairly say it is "private in substance" (see *County of Inyo v. Jeff* (1991) 227 Cal.App.3d 487, 494 [county's action on behalf of Indian child to collect delinquent child support from tribe member mother deemed to be private in substance]), we agree with Huber that it falls outside the grant of civil jurisdiction in Public Law 280.

2.      The Conflation of Preemption and Subject Matter Jurisdiction

The Attorney General argues that subject matter jurisdiction in this case is not, and need not be, founded upon Public Law 280. For this position, he relies heavily on a line of United States Supreme Court cases upholding state laws regulating cigarette sales by and to tribal members in the face of preemption challenges on grounds of Indian sovereignty. (See *Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation* (1976) 425 U.S. 463 (*Moe*); *Washington v. Confederated Tribes of Colville Indian Reservation* (1980) 447 U.S. 134 (*Colville*); *Department of Taxation & Finance of New York v. Milhelm Attea & Bros., Inc.* (1994) 512 U.S. 61 (*Milhelm*).) These cases, according to the Attorney General, recognize that "an express federal statutory grant,

_____

are "more analogous" to the private legal disputes falling within Public Law 280's civil jurisdiction than to the taxation and gambling statutes at issue in *Bryan* and *Cabazon*, which "regulate the conduct of the public at large." (*Doe*, 415 F.3d at p. 1059.) The panel in *Doe*, however, did not rest its conclusion as to the applicability of Public Law 280 solely on the purported distinction between proceedings relating to status and broader regulatory regimes. (*Doe*, at p. 1061.) Instead, the court went on to conclude ICWA contemplates that, unless a tribe follows specified procedures to "reassume" jurisdiction, Public Law 280 states retain Public Law 280 jurisdiction (25 U.S.C. § 1918(a)) in "child custody proceedings" (25 U.S.C. § 1903(i)), thus bringing the case within an exception to ICWA's reservation of exclusive tribal jurisdiction for situations in which "jurisdiction is otherwise vested in the State by existing federal law." (25 U.S.C. § 1911(a).) (*Doe*, at pp. 1061-1062.) Obviously, this latter part of the holding in *Doe* is unique to ICWA law and has no applicability here, but what is significant about the case is that, having concluded that the underlying Lake County case did not involve a truly "private dispute" falling clearly within the grant of Public Law 280 jurisdiction, the panel took on the difficult next step of the analysis, looking for and finding a basis for congressionally conferred jurisdiction elsewhere.

14

such as Public Law 280, is not the sole source of state regulatory authority over an Indian in Indian Country."

Citing *People ex rel. Harris v. Black Hawk Tobacco, Inc.* (2011) 197 Cal.App.4th 1561 (*Black Hawk*), which applied the *Moe-Colville-Milhelm* line of preemption cases in a Business and Professions Code section 17200 action brought by the State of California, the Attorney General, in essence, equates a finding of no preemption with the existence of subject matter jurisdiction. *Black Hawk*, like this case, involved tobacco smokeshops operated on Indian trust land, there on allotments of the Agua Caliente Band of Cahuilla Indians (the Band) in Riverside County. (*Black Hawk*, at pp. 1564-1565.) We should follow *Black Hawk*, the Attorney General argues, since that case was a UCL proceeding in which, as here, the predicate "unlawful" acts included sales of cigarettes in violation of the Directory Act and the Fire Safety Act. (*Black Hawk*, at p. 1565.) It is true that, in *Black Hawk*, the Court of Appeal affirmed a preliminary injunction against the operators of the smokeshops, but Public Law 280 was never raised in that case and thus the court did not address it. (*Black Hawk*, at pp. 1564, 1566-1567, 1572.) While the smokeshop defendants in *Black Hawk* appear to have asserted some sort of jurisdictional challenges in the trial court (*id.* at p. 1566), they did not appeal on that ground, instead mounting a "new argument that the State of California has no right to regulate tobacco sales on the Band's reservation because the Band has the exclusive authority to regulate tobacco sales on the reservation." (*Id.* at p. 1567.) The Court of Appeal panel rejected the argument, upholding the trial court's ruling that the state could apply its laws to the smokeshops. (*Id.* at pp. 1569-1571.) The panel relied on *Moe* and *Colville*, as the trial court did, and never mentioned subject matter jurisdiction. (*Black Hawk*, at pp. 1566, 1569-1571.)

In her treatment of *Black Hawk*, Huber draws an analytical distinction that we think brings some clarity to the sometimes loose use of the term "jurisdiction" in the case law in this area. While the ultimate issue before the high court in *Bryan, supra,* 426 U.S. 373 was the reach of state tax law into Indian country—a question of *legislative jurisdiction*—the effect of its construction of section 4(a) of Public Law 280 was to confine the civil *adjudicative jurisdiction* of state courts to the enforcement of state law

15

in private disputes.[8]  What this means for our purposes is that, under the holding in *Bryan*, *supra*, 426 U.S. 373, we may proceed to apply California law unless it is preempted by federal law, but the antecedent question of adjudicative jurisdiction must be addressed first, at the threshold.  As we read *Bryan*, if there is no adjudicative jurisdiction, we have no need to proceed further to the question of preemption—indeed we have no power to do so.  This, fundamentally, is the subject matter jurisdiction issue Huber raises here.  It is a close and difficult question, but with a few exceptions we agree

---

[8] The difference between jurisdiction to adjudicate, on the one hand, and jurisdiction to legislate, on the other, is well recognized in California law (2 Witkin, Cal. Procedure (5th ed. 2008) Jurisdiction, § 5, pp. 578-579 (Witkin)) as it is in state and federal law generally (see generally Willis L.M. Reese, *Legislative Jurisdiction,* 78 Colum. L.Rev. 1587, 1587-1594 (1978)), and has often been noted by the high court in Indian law cases involving tribal courts (see *Strate v. A-1 Contractors* (1997) 520 U.S. 438, 453; Cohen, *supra,* § 7.01, pp. 597-598).  Adjudicative jurisdiction concerns "a court's competency to decide the issue before it" (Witkin, *supra*, § 11, at p. 584), while legislative jurisdiction involves the prescriptive power of " 'a state to make its law applicable to persons or activities' " (*Hartford Fire Ins. Co. v. State of California* (1993) 509 U.S. 764, 813 (dis. opn. of Scalia, J.)).  To put it succinctly, legislative jurisdiction is "the power of a state to *apply* its laws to any given set of facts" (italics added), whereas adjudicative jurisdiction "is the power of a state to *try* a particular action in its courts." (*McCluney v. Jos. Schlitz Brewing Co.* (8th Cir. 1981) 649 F.2d 578, 581, fn. 3, affd. (1981) 454 U.S. 1071.)

Prior to *Bryan*, the few reported California decisions addressing Public Law 280 read it as a grant of legislative jurisdiction (e.g., *Acosta v. San Diego County* (1954) 126 Cal.App.2d 455, 460, 463-464 [Public Law 280 cited as one of a number of statutes conferring authority on the state to extend its civil and criminal laws to Indian reservations]; see Witkin, *supra,* § 5, p. 578 [citing *Acosta* as an example of a case addressing the issue of legislative jurisdiction]), and took as a given that, prior to the enactment of Public Law 280, civil regulatory statutes could not be applied to conduct by tribe members on Indian reservations (*see Arnett v. Five Gill Nets* (1975) 48 Cal.App.3d 454, 459, 461-462 [rejecting contention that Public Law 280 authorized application of statute regulating fishing rights on Klamath River Reservation]; *Elser v. Gill Net No. One* (1966) 246 Cal.App.2d 30, 36-37 [same]).

16

with her that none of the cases on which the Attorney General relies squarely addresses it.[9]

The one exception in California law is the Third District's recent decision in *People ex rel. Becerra v. Rose* (2017) 16 Cal.App.5th 317 (*Rose*), which was decided after the close of briefing. *Rose*, like *Black Hawk* and this case, was a UCL public enforcement action by the Attorney General against an Indian-owned retail tobacco business. (*Rose*, at pp. 321-323.) It, too, involved alleged violations of the Tax Stamp Act, the Directory Act, and the Fire Safety Act. (*Id.* at pp. 322-323.) The defendant, Rose, was a member of the Alturas Indian Rancheria, but his smokeshops were located more than 150 miles from the rancheria on allotments in which the Alturas had no interest. (*Id.* at p. 322.) *Rose* follows and adopts the no-preemption holding in *Black Hawk*, relying in part on *Colville* (*Rose*, at pp. 328-329), but goes further, expressly rejecting the Public Law 280 argument that is the centerpiece of Huber's argument in this case. (*Rose*, at pp. 329-331.) In doing so, the *Rose* court addressed the issue of preemption first, resolved it in favor of applying state law (*id.* at pp. 328-329), and then saw no need to analyze jurisdiction under Public Law 280, explaining as follows: "Rose cites two cases—*Bryan v. Itasca County* . . . and *Doe v. Mann* . . . . But those cases addressed only whether Public Law 280 conferred subject matter jurisdiction on state courts. They did not address the broader issue of whether California and its courts have

---

[9] In addition to *Black Hawk*, *supra*, 197 Cal.App.4th 1561, the Attorney General relies on out-of-state authority in which the enforceability of state statutes governing cigarette sales by Indian smokeshop businesses was at issue, including two federal cases (see *King Mountain Tobacco Inc. v. McKenna* (9th Cir. 2014) 768 F.3d 989; *Muscogee (Creek) Nation v. Pruitt* (10th Cir. 2012) 669 F.3d 1159) and two state cases (*State ex rel. Edmondson v. Native Wholesale Supply* (Okla. 2010) 237 P.3d 199 (*Native Wholesale Supply I*); *State ex rel. Pruitt v. Native Wholesale Supply* (Okla. 2014) 338 P.3d 613 (*Native Wholesale Supply II*)). None of these cases addresses the issue of state court subject matter jurisdiction under Public Law 280, because each case arose either in federal court (*King Mountain*, *Muscogee*) or in a non-Public Law 280 state (*Muscogee*, *Native Wholesale Supply I*, *Native Wholesale Supply II*).

jurisdiction because such jurisdiction is not preempted by federal law and tribal sovereignty. This is not a Public Law 280 case." (*Rose*, at p. 330.)

To us, it is not clear what "the broader issue" of preemption, the effect of which is a *negation* of power, not a grant of it, has to do with adjudicative jurisdiction. Every California case involving Indian litigants in Indian country is "a Public Law 280 case"— in the sense that the statute must be applied, and if its terms are met (either by considering Public Law 280 alone or in the context of another statutory scheme such as ICWA, as it was in *Doe*, *supra*, 415 F.3d 1038, see *ante*, fn. 7), the case may proceed, while if they are not, the case must be dismissed—unless some other grant of congressional authority to adjudicate can be found. Ultimately, the concluding statement in *Rose* that "California courts have routinely exercised subject matter jurisdiction in cases in which the state's civil/regulatory laws may be applied to Indian country" is most telling. (*Rose, supra,* 16 Cal.App.5th at p. 330.) Far from routine assumption of subject matter jurisdiction in cases involving assertion of civil/regulatory laws, the small sample of such cases we could find suggests that, following *Bryan*, California courts have dismissed for lack of subject matter jurisdiction where a jurisdictional objection was raised.[10] Two California cases are cited in *Rose* as counter examples, the first of which, *People v. McCovey*, *supra*, 36 Cal.3d 517, is a criminal case—an area in which it has never been doubted that Public Law 280 grants California plenary jurisdiction to adjudicate—and the second, *Black Hawk, supra,* 197 Cal.App.4th 1561, as we have

---

[10] E.g., *Boisclair*, *supra*, 51 Cal.3d at pp. 1153, 1156, 1158-1159 (holding trial court should have dismissed request for declaratory relief for lack of subject matter jurisdiction under section 4(b) of Public Law 280 (28 U.S.C. § 1360(b)) because alleged easement rights to road running through Indian trust land implicated " 'ownership or right to possession of [Indian] property' "); *Middletown Rancheria*, *supra*, 60 Cal.App.4th at pp. 1343, 1352 (granting writ of review and holding Workers' Compensation Appeals Board lacked subject matter jurisdiction over tribal employee's claim because proceedings deemed regulatory and thus not a private dispute within section 4(a) of Public Law 280 (28 U.S.C. § 1360(a))).

18

noted, does not address the issue of subject matter jurisdiction. (*Rose,* at p. 330.) Thus, we do not find *Rose* to be persuasive on this point.

What is problematic about the *Rose* court's treatment of Public Law 280, in our view—a flaw also reflected in the position taken by the Attorney General in this case—is that it conflates adjudicative jurisdiction and legislative jurisdiction. He cites to a passage in *Cabazon* in which the high court stated it has "not established an inflexible *per se* rule precluding state jurisdiction over tribes and tribal members in the absence of express congressional consent" (*Cabazon*, *supra*, 480 U.S. at pp. 214-215), but the quoted passage is from a section of the *Cabazon* opinion specifically addressing preemption, not adjudicative jurisdiction. Although the Attorney General correctly points out Public Law 280 is not "the sole possible source for state authority in this area," that seems to us beside the point. It is true, as we shall discuss below (*see* section III.D.1, *post*), that the modern doctrine of Indian preemption leaves room for implied state legislative authority over Indians in Indian country based on a weighing of competing policy interests, but judicial power is a separate and distinct matter and must rest on some express delegation of authority. We cannot confer jurisdiction on ourselves, based on a weighing of policy interests, or for any other reasons not grounded in a legislative grant from Congress.

When pressed on the issue of subject matter jurisdiction at oral argument, the Attorney General's fallback position was that nothing in Public Law 280 withdrew any aspect of the California courts' preexisting general jurisdiction. All Public Law 280 did, he suggested, was expand the adjudicative jurisdiction over Indians in Indian country that California courts already enjoyed. We see two basic problems with this point of view. First, taking the argument on its own terms, we have difficulty seeing what there was to expand if jurisdiction was general to begin with. The default rule that the courts of this state have subject matter jurisdiction to enforce California law in any case where there is personal jurisdiction over the parties does not supply an adequate answer to the question Huber raises, for if it did, Public Law 280 was an idle act by Congress. Second, the argument runs contrary to a fundamental premise of the *Bryan* opinion—that, as a

19

compromise measure, Public Law 280 granted narrow civil adjudicative jurisdiction as a way to avoid the "devastating impact on tribal governments that might result from an interpretation of § 4 as conferring upon state and local governments general civil regulatory control over reservation Indians." (*Bryan*, *supra*, 426 U.S. at p. 388, fn. 14.) Supplanting section 4(a) with state court general jurisdiction effectively transforms Public Law 280 into the full and complete assimilationist measure the high court held it was never intended to be. (*Bryan,* at p. 390.)

This is not a case, to be sure, in which an alternative tribal or federal forum appears to be available for a civil enforcement action by the State of California. But in our view, that is an inevitable consequence of *Bryan*'s conclusion that section 4(a) of Public Law 280 does not extend "general state civil regulatory control over Indian reservations." (*Bryan*, *supra*, 426 U.S. at p. 384.) Because, in the absence of such a grant, the exercise of state judicial power over on-reservation conduct by a Wiyot Tribe member impedes the tribe's ability to foster and protect its own way of enforcing the rule of law, we cannot agree that, in the absence of express congressional authorization, the general jurisdiction of California courts supplies a basis to proceed in this case. In this specialized area, the California courts are more like courts of limited jurisdiction than courts of general jurisdiction when it comes to disputes involving the on-reservation conduct of tribe members, and as a result, the first and most fundamental question to ask before proceeding in such a case is whether we are empowered to act. Under the grant of civil adjudicative jurisdiction in Public Law 280, we hold that the answer to that question here is no.

## C. *Public Law 280: Criminal/Prohibitory Jurisdiction*

Having concluded that this case falls outside the grant of civil adjudicative jurisdiction in Public Law 280, we come to the next question posed by the holding in *Bryan*—whether subject matter jurisdiction exists over any of the claims alleged in this case because the statutes being asserted here may be deemed criminal/prohibitory in

nature and thus within the grant of criminal jurisdiction in section 2 of Public Law 280 (codified in 18 U.S.C. § 1162).[11]

Cabazon sets the frame of analysis. The Cabazon case involved two federally recognized bands of Mission Indians in Riverside County, the Morongo and the Cabazon, each of which operated bingo games on its reservation. (Cabazon, supra, 480 U.S. at pp. 204-205.) The State of California sought to enforce against these tribes Penal Code section 326.5, which, as the high court read it, "does not entirely prohibit the playing of bingo but permits it when the games are operated and staffed by members of designated charitable organizations who may not be paid for their services. Profits must be kept in special accounts and used only for charitable purposes; prizes may not exceed $ 250 per game." (Cabazon, at p. 204.) The high court's opinion reversing put to rest any notion that Bryan was a narrow decision, applicable only to assertions of state taxing power. Even though California, exercising its police powers, sought to invoke what was nominally a penal statute in Cabazon, the court held that "when a State seeks to enforce a law within an Indian reservation under the authority of Pub.L. 280, it must be determined whether the law is criminal in nature, and thus fully applicable to the reservation under §

---

[11] Section 2 of Public Law 280, 18 U.S.C. § 1162, provides as follows:

"(a) Each of the States . . . listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed . . . to the same extent that such State . . . has jurisdiction over offenses committed elsewhere within the State . . . and the criminal laws of such State . . . shall have the same force and effect within such Indian country as they have elsewhere within the State . . . :

"State or Territory of                    Indian country affected

[¶ . . . ¶]

California…………………………All Indian country within the State."

[¶ . . . ¶]

Structurally, section 2 is laid out similarly to section 4, with a series of proviso clauses (none of which is relevant here) following section 2. The same states are listed for both section 2 and section 4.

2, or civil in nature, and applicable only as it may be relevant to private civil litigation in state court." (*Id*. at p. 208.)

"[I]f the intent of a state law is generally to prohibit certain conduct," the court explained, "it falls within Pub.L. 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub.L. 280 does not authorize its enforcement on an Indian reservation. The shorthand test is whether the conduct at issue violates the state's public policy." (*Cabazon*, *supra*, 480 U.S. at p. 209.) The remedies attached to a statute are not necessarily dispositive because that would allow states to avoid a regulatory classification simply by attaching some form of criminal sanction. (See *id.* at p. 211 ["[T]hat an otherwise regulatory law is enforceable by criminal as well as civil means does not necessarily convert it into a criminal law within the meaning of Pub.L. 280. Otherwise, the distinction between [Public Law 280's criminal jurisdiction and civil jurisdiction] could easily be avoided"].) Ultimately, in *Cabazon*, the court determined that the bingo laws at issue were regulatory in nature, even though enforced with penal sanctions, because "California permits a substantial amount of gambling activity, including bingo, and actually promotes gambling through its state lottery," demonstrating that "California regulates rather than prohibits gambling in general and bingo in particular." (*Cabazon,* at p. 211.)

Applying this test to the three causes of action pleaded in this case, we think that two of the three claims, the first, for violation of the Directory Act, and the second, for violation of the Fire Safety Act, rest on statutes that are criminal/prohibitory in nature and thus may be enforced under Public Law 280's grant of criminal jurisdiction. The Directory Act establishes a categorical ban on the sale of cigarettes purchased from manufacturers who have not certified their compliance with the MSA or made escrow payments in lieu thereof. (Rev. & Tax. Code, § 30165.1, subd. (e)(2).) A useful analogy, in our view, is to statutory prohibitions on cigarette sales to minors or underage drinking,

22

two examples of categorical bans which have been found to be criminal/prohibitory in nature.[12] The Fire Safety Act presents a closer question, but we think it too is criminal/prohibitory in nature. Here again we have a statute that sets up a categorical ban, in the case of this statute on all products offered for sale that do not meet certification requirements for noncombustible packaging. (Health & Saf. Code, § 14951, subd. (a).) It is analogous, we think, to statutes prohibiting the general possession and/or sale of certain classes of fireworks subject to narrow exceptions.[13] In assessing the proper classification of these two laws, we find it significant that both meet the *Cabazon* shorthand test for statutes outlawing conduct in violation of public policy (*Cabazon, supra,* 480 U.S. at p. 209), since both involve transgressions more serious than violation of a statute per se, but also create hazards to public health and safety.

Unlike the Directory Act and the Fire Safety Act, we view the third cause of action for violation of the UCL as a claim founded on a civil/regulatory law and thus outside Public Law 280's grant of criminal jurisdiction. The UCL is a trade regulation statute. California permits open business competition—indeed promotes it—and the UCL regulates competition by making illegal only a subset of business practices that are "unlawful, unfair or fraudulent," as well as advertising that is "unfair, deceptive, untrue or misleading." (Bus. & Prof. Code, § 17200.) A useful analogy here is to cases involving attempted enforcement under Public Law 280 of driving infraction laws on Indian reservations; these laws apply to all driving, which is, of course, generally allowed, but they forbid only certain subsets of driving, such as driving over a certain speed limit[14] or driving without proof of insurance.[15] The Attorney General emphasizes

---

[12] *State v. Lasley* (Iowa 2005) 705 N.W.2d 481, 490-491 [cigarette sales to minors]; *State v. Robinson* (Minn. 1997) 572 N.W.2d 720, 722-724 [underage drinking].

[13] *Quechan Indian Tribe v. McMullen* (9th Cir.1993) 984 F.2d 304, 307; *United States v. Marcyes* (9th Cir. 1977) 557 F.2d 1361, 1364.

[14] *Confederated Tribes of the Colville Reservation v. Washington* (9th Cir.1991) 938 F.2d 146, 148-149.

[15] *State v. Johnson* (Minn. 1999) 598 N.W.2d 680, 681, 683.

that the "unlawful" acts alleged in the third cause of action are based derivatively on alleged violations of the Directory Act, the Fire Safety Act, and the Tax Stamp Act, and we should look to the intent of the underlying statutes to determine whether they are criminal/prohibitory. But it is the intent of the UCL that counts. To the extent the UCL is being used here as an enforcement tool targeting unlawful acts under more specific statutes, that simply illustrates the dividing line we draw: The UCL applies to business competition generally, which is not only permitted but promoted in California, and outlaws only specific practices comprising a subset of competition.

Accordingly, we agree with Huber that the trial court lacked adjudicative jurisdiction to proceed on the third cause of action seeking to enforce the Tax Stamp Act, the Directory Act, and the Fire Safety Act derivatively through the UCL, and thus we hold that the court erred by granting summary adjudication against her and issuing an injunction on that claim.[16] But at the same time we agree with the Attorney General that the court had adjudicative jurisdiction to proceed on the first and second causes of action seeking to enforce the Directory Act and the Fire Safety Act directly, which requires that we proceed to examine whether the Directory Act and the Fire Safety Act may be applied to the conduct at issue in this case. It is to that issue we now turn.

D.     *Preemption*

    1.     Applicable Principles

"The relation between the Indians and the states has by no means remained constant since the days of John Marshall." (*Village of Kake*, *supra*, 369 U.S. at p. 71.) Over the many years since that time, "Congress has to a substantial degree opened the doors of reservations to state laws" (*id*. at p. 74) to such a degree that " '[o]rdinarily,' . . .

---

[16] In addition to her attack on subject matter jurisdiction, Huber makes a series of other statutory interpretation arguments directed at the UCL claim, all of which rest on the contention that the claimed violations of the Directory Act, the Fire Safety Act, and the Tax Stamp Act cannot be used as predicate unlawful acts to support the UCL claim. We need not address these contentions in light of the disposition we reach with respect to the third cause of action.

24

'an Indian reservation is considered part of the territory of the State.' " (*Nevada v. Hicks* (2001) 533 U.S. 353, 361-362; see also *Village of Kake*, *supra*, at p. 72; *Acosta v. San Diego County*, *supra*, 126 Cal.App.2d at p. 463.) Although as of the early 1960s, it was still true that the "[d]ecisions of [the United States Supreme Court were] few as to the power of the states when not granted Congressional authority to regulate matters affecting Indians" (*Village of Kake*, *supra*, at p. 74), a deep body of high court case law has now developed concerning when, in the absence of an express congressional grant of power, state law may be applied to reservation Indians.

The high court summarized the applicable principles in *White Mountain Apache Tribe v. Bracker* (1980) 448 U.S. 136 (*Bracker*) as follows: "Congress has broad power to regulate tribal affairs under the Indian Commerce Clause, Art. 1, § 8, cl. 3. [Citation.] This congressional authority and the 'semi-independent position' of Indian tribes have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law. [Citations.] Second, it may unlawfully infringe 'on the right of reservation Indians to make their own laws and be ruled by them.' [Citations.] The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members. They are related, however, in two important ways. The right of tribal self-government is ultimately dependent on and subject to the broad power of Congress. Even so, traditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important 'backdrop,' [citation] against which vague or ambiguous federal enactments must always be measured.

"The unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of pre-emption that have emerged in other areas of the law. Tribal reservations are not States, and the differences in the form and nature of their sovereignty make it treacherous to import to one notions of pre-emption that are properly applied to the other. The tradition of Indian sovereignty over the reservation and tribal members must inform the determination

25

whether the exercise of state authority has been pre-empted by operation of federal law. [Citation.] . . . [T]his tradition is reflected and encouraged in a number of congressional enactments demonstrating a firm federal policy of promoting tribal self-sufficiency and economic development.  Ambiguities in federal law have been construed generously in order to comport with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence.  [Citation.]  We have thus rejected the proposition that in order to find a particular state law to have been pre-empted by operation of federal law, an express congressional statement to that effect is required.  [Citation.]  At the same time any applicable regulatory interest of the State must be given weight [citation], and 'automatic exemptions "as a matter of constitutional law" ' are unusual.  [Citation.]

"When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest.[17] . . .  More difficult questions arise where . . . a State asserts authority over the conduct of non-Indians engaging in activity on the reservation.  In such cases we have examined the language of the relevant federal treaties and statutes in terms of both the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence.  This inquiry is not dependent on mechanical or absolute conceptions of state or tribal sovereignty but has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.  [Citations.]" (*Bracker*, *supra*, 448 U.S. at pp. 142-145.)

---

[17] *New Mexico v. Mescalero Apache Tribe* (1983) 462 U.S. 324, 331-332 (*New Mexico II*) (only "in exceptional circumstances [may] a State . . . assert jurisdiction over the on-reservation activities of tribal members").

2.       *Moe*, *Colville*, and *Milhelm*

*Bracker, supra,* 448 U.S. 136 summed up an area of law in which *Moe*, *supra*, 425 U.S. 463, *Colville*, *supra*, 447 U.S. 134, and *Milhelm*, *supra*, 512 U.S. 61—each involving cigarette sales on Indian reservations and the extent to which state taxation and regulation schemes may be applied to those sales—are leading decisions.  Thus, the parties rightly devote a great deal of attention to these three cases in their briefs.  Although ultimately disagreeing about how the *Moe-Colville-Milhelm* line of precedent should be applied here, they largely agree about what each case held.

*Moe, supra*, 465 U.S. 463 involved consolidated appeals in two cases that arose on the Flathead reservation in Montana, where a member of the Confederated Salish and Kootenai Tribes operated retail smokeshops.  (*Moe*, at pp. 465-466.)  A Montana statute required all tobacco vendors to hold state-issued licenses, and all licensed vendors to collect an excise tax on retail sales of cigarettes by affixing tax stamps on cigarettes sold at retail.  (*Id.* at p. 467.)  When two tribe members were arrested by Montana authorities for the misdemeanor offenses of operating without a license and selling cigarettes without tax stamps affixed to them, they sued in federal district court to enjoin enforcement.  (*Id.* at pp. 467-468.)  And in a second, related case, the tribe and some of its members sued to enjoin enforcement of a statute imposing a personal property tax on vehicles owned by tribe members living on the reservation.  (*Id.* at pp. 468-469.)

Citing cases barring states from directly taxing Indian-owned property or income earned by Indians on a reservation, the district court held Montana could not apply its tax on vehicles, its vendor licensing scheme, or its cigarette taxing scheme, with one significant exception:  Montana "may require a pre-collection of the tax imposed by law upon the non-Indian purchaser of the cigarettes."  (*Moe*, *supra*, 425 U.S. at pp. 468-469.)  The high court affirmed, and the last element of its opinion—upholding the requirement of pre-collection of excise tax owed by non-tribal purchasers of cigarettes (*id.* at pp. 481-483)—is the anchor for the later decisions in *Colville, supra*, 447 U.S. 134 and *Milhelm, supra*, 512 U.S. 61 building on it.

Essentially, what the court held is that, to prevent tax evasion by non-Indians who purchase cigarettes, Montana may enlist tribal sellers in an effort to collect tax owed by these shoppers. (*Moe*, *supra*, 425 U.S. at pp. 481-483.) The court explained, "Since nonpayment of the tax is a misdemeanor as to the retail purchaser, the competitive advantage which the Indian seller doing business on tribal land enjoys over all other cigarette retailers, within and without the reservation, is dependent on the extent to which the non-Indian purchaser is willing to flout his legal obligation to pay the tax." (*Id.* at p. 482.) Noting that the burden imposed on Indian sellers "is not, strictly speaking, a tax at all" because the ultimate tax burden falls on purchasers—which is why cases invalidating direct taxation of reservation Indians did not apply—the court held that the precollection requirement was nothing more than an expedient "minimal burden designed to avoid the likelihood that in its absence non-Indians purchasing from the tribal seller will avoid payment of a concededly lawful tax." (*Id.* at p. 483.)

*Colville* expands the core holding in *Moe* in a number of ways. The appeal there was from a district court judgment in consolidated cases, both involving cigarette sales by Indian smokeshops on reservation land in the State of Washington. (*Colville, supra,* 447 U.S. at p. 139.) One case involved the Colville, Lummi, and Makah reservations, and the other involved the Yakima reservation. (*Id.* at pp. 139, 143-144.) These tribes, like the Wiyots, had their own scheme of taxing sales of cigarettes under tribal law. (*Id.* at pp. 144-145.) Washington had a tax stamp system that required precollection of an excise tax, similar to the one involved in *Moe*, but the Washington scheme went beyond Montana's by imposing on sellers detailed recordkeeping requirements. (*Colville,* at pp. 143, 151.) Also presented for decision in *Colville* were enforcement issues concerning whether Washington had the power to seize unstamped cigarettes as contraband and whether Indians living on a reservation who were not members of the reservation tribe could be taxed directly. (*Id.* at pp. 160-161.)

The holdings in *Colville* on this complex array of issues are noteworthy in three respects. First, Washington's scheme of taxing nonmembers who make on-reservation purchases was found to be valid and not preempted. (*Colville, supra,* 447 U.S. at

28

pp. 154-155.)  Here, the court observed that "the value marketed by the smokeshops to persons coming from outside is not generated on the reservations by activities in which the Tribes have a significant interest." (*Id.* at p. 155.)  "What the smokeshops offer these customers," the court said, "is solely an exemption from state taxation." (*Ibid.*)  The court rejected the proposition that "principles of federal Indian law, whether stated in terms of pre-emption, tribal self-government, or otherwise, . . . authorize Indian tribes to market an exemption from state taxation to persons who would normally do their business elsewhere." (*Ibid*.)

The tribes' reliance on their own local schemes of taxing and regulating cigarette sales failed. (*Colville, supra,* 447 U.S. at pp. 158-159.)  "There is no direct conflict between the state and tribal schemes, since each government is free to impose its taxes without ousting the other," the court concluded, and "the State does not interfere with the Tribes' power to regulate tribal enterprises when it simply imposes its tax on sales to nonmembers." (*Ibid*.)  After weighing the federal, tribal, and state interests involved, the court found no preemption, pointing out that the "simple collection burden imposed by Washington's cigarette tax on tribal smokeshops is legally indistinguishable from the collection burden upheld in *Moe*." (*Id.* at p. 159.)  For the most part, this portion of the opinion—comprising its primary holding—is a straightforward application of *Moe*; it plows new ground only to the extent it upholds Washington's recordkeeping requirement, an added administrative burden on tribal sellers that was not present in *Moe*. (*Colville,* at pp. 151, 159-160.)  The tribes had the burden of showing that the recordkeeping requirements were "not reasonably necessary as a means of preventing fraudulent transactions," and they failed to meet it. (*Id*. at p. 160.)

Second, the court found that Washington was empowered "to apply its sales and cigarette taxes to Indians resident on the reservation but not enrolled in the governing Tribe." (*Colville, supra,* 447 U.S. at p. 160.)  The court held that, although such persons fell within the federal statutory definition of "Indian," that fact did not demonstrate a congressional intent to exempt non-tribe members from taxation. (*Id.* at p. 161.)  The court focused instead on whether taxing nonmembers "contravene[s] the principle of

29

tribal self-government." (*Ibid.*) It did not, the court explained, "for the simple reason that nonmembers are not constituents of the governing Tribe." (*Ibid.*) Third, and finally, the court found Washington had "power to seize unstamped cigarettes" off-reservation, where the "state power over Indian affairs is considerably more expansive than it is within reservation boundaries." (*Id.* at pp. 161-162.) Having so held, however, the court declined to reach the question whether Washington "may enter onto the reservations, seize stocks of cigarettes which are intended for sale to nonmembers, and sell these stocks in order to obtain payment of the taxes due." (*Id.* at p. 162.)

*Milhelm* picked up where *Moe* and *Colville* left off, but specifically addressed the wholesale level of distribution. Historically, under federal legislation known as the Indian Trader Statutes, enacted pursuant to the Indian Commerce Clause and designed to protect against exploitation of tribes by Indian traders, and under prior Supreme Court case law, federally licensed trading agents have been exempt from state taxation, just as tribe members are exempt from state taxation. (*Milhelm, supra,* 512 U.S. at pp. 68, 70.) Responding to reports of huge quantities of unstamped cigarettes being shipped into Indian reservations at the wholesale level by Indian traders—volumes that were far in excess of the amounts tribe members would be expected to consume—New York attempted to cut off the supply of what appeared to be a black market in untaxed cigarettes on Indian reservations by adopting regulations that imposed strict recordkeeping requirements and quantity limitations on wholesalers. (*Id.* at pp. 64-67.) The question presented was whether federal statutes governing trade with Indians preempted New York's program. (*Id.* at p. 64.)

Reviewing a decision of the New York Court of Appeals that held New York's regulations preempted by the Indian Trader Statutes, the high court framed the issue as follows. "Because New York lacks authority to tax cigarettes sold to tribal members for their own consumption, see *Moe* [*, supra,*] 425 U.S. 463, 475-481 . . . , cigarettes to be consumed on the reservation by enrolled tribal members are tax exempt and need not be stamped. On-reservation cigarette sales to persons other than reservation Indians, however, are legitimately subject to state taxation. See . . . *Colville* . . . 447 U.S. 134,

30

160-161 . . . . [¶] To ensure that nonexempt purchasers do not likewise escape taxation, the regulations limit the quantity of untaxed cigarettes that wholesalers may sell to tribes and tribal retailers." (*Milhelm*, *supra*, 512 U.S. at pp. 64-65, 68-69.)

The court reversed, extending *Moe* and *Colville* with the following explanation: "The specific kind of state tax obligation that New York's regulations are designed to enforce—which falls on non-Indian purchasers of goods that are merely retailed on a reservation—stands on a markedly different footing from a tax imposed directly on Indian traders, on enrolled tribal members or tribal organizations, or on 'value generated on the reservation by activities involving the Tribes,' *Colville,* 447 U.S., at 156-157. *Moe* [and] *Colville* . . . make clear that the States have a valid interest in ensuring compliance with lawful taxes that might easily be evaded through purchases of tax-exempt cigarettes on reservations; that interest outweighs tribes' modest interest in offering a tax exemption to customers who would ordinarily shop elsewhere. The 'balance of state, federal, and tribal interests,' [citation], in this area thus leaves more room for state regulation than in others. In particular, these cases have decided that States may impose on reservation retailers minimal burdens reasonably tailored to the collection of valid taxes from non-Indians.

"Although *Moe* and *Colville* dealt most directly with claims of interference with tribal sovereignty, the reasoning of those decisions requires rejection of the submission that [a provision of the Indian Trader Statutes] bars any and all state-imposed burdens on Indian traders. . . . [¶] . . . [¶] . . . We are persuaded . . . that New York's decision to stanch the illicit flow of tax-free cigarettes early in the distribution stream is a 'reasonably necessary' method of 'preventing fraudulent transactions,' one that 'polices against wholesale evasion of [New York's] own valid taxes without unnecessarily intruding on core tribal interests.' *Colville,* 447 U.S., at 160 []. The sole purpose and justification for the quotas on untaxed cigarettes is the state's legitimate interest in avoiding tax evasion by non-Indian consumers. . . . [¶] . . . [¶] . . . [And b]y requiring wholesalers to precollect taxes on, and affix stamps to, cigarettes destined for nonexempt consumers, New York has simply imposed on the wholesaler the same precollection

31

obligation that, under *Moe* and *Colville,* may be imposed on reservation retailers." (*Milhelm*, *supra*, 512 U.S. at pp. 73-76, fns. omitted.)

3.      Preemption Analysis

Arguing for preemption, Huber emphasizes that this case involves solely on-reservation conduct among Indians, and, to the extent her operations extended beyond the border of the Table Bluff Rancheria, her business was with other tribes on other reservations. In her account of the facts, all she did was make wholesale deliveries to other tribes on their reservations "as a courtesy," while contractually taking and accepting every order at the only store location she had, in her house on the Table Bluff Rancheria. She insists the trial court made no finding that she conducted business off-reservation. What the trial court actually found, she says, is that her business involved extensive "off-reservation contacts," a concept she contends might be relevant to an issue of personal jurisdiction, but that has no legal significance here.

Huber relies heavily on our Supreme Court's decision in *Naegele*, *supra*, 38 Cal.3d 509, a case involving an attempt by the California Department of Transportation to use California's Outdoor Advertising Act (Bus. & Prof. Code, § 5200 et seq.) to regulate billboard signage on an Indian reservation that was visible from a state highway running through the reservation. (*Naegele*, at pp. 513-514.) The *Naegele* court found this enforcement effort preempted. (*Id.* at p. 522.) If "off-reservation safety and aesthetic effects were insufficient to justify state regulation . . ." of on-reservation activities in *Naegele*, Huber argues, the off-reservation effects relied upon by the trial court are insufficient to avoid preemption here as well. This argument misses the thrust of the analysis in *Naegele*, where there was a detailed federal statutory scheme and the court found Congress did not intend to permit state regulation of billboards on Indian reservations. (*Id.* at pp. 515, 522.) The opinion thus turned on principles of federal obstacle preemption. (*Id.* at p. 522; see *Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935-936 [summarizing types of federal preemption; "obstacle preemption arises when ' "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment

32

and execution of the full purposes and objectives of Congress" ' "].)  There is no pervasive federal statutory scheme here.

The Attorney General bases his argument against preemption on the general idea that Indian reservations are not legal islands unto themselves and that whatever vestiges of sovereignty they still enjoy must give way in matters of commerce affecting the welfare of state citizens outside their borders.  "Absent express federal law to the contrary," he points out, "Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State."  (*Mescalero Apache Tribe v. Jones* (1973) 411 U.S. 145, 148-149 (*New Mexico I*).)  To the extent Huber operated on-reservation, the Attorney General contends, much of her business was with non-tribe members who were enticed onto the Table Bluff Rancheria by her promotions.  He points out that Huber "maintained websites that advertised 'tax free' and 'cheaper cigarette[s]' and encouraged customers to 'come see us!,' sold cigarettes via mail order, and had a toll-free phone number.  [She] did not check for tribal identification and admits she sold cigarettes to the general public."

The Attorney General also draws our attention to the scale of Huber's enterprise. What she portrays as a "small storefront" operation run out of her house is not, in fact, some tiny, exclusively on-reservation business, he points out.  Huber "sold huge quantities of noncompliant cigarettes.  Between November 23, 2009 and October 1, 2013, she sold, distributed, and transported at least 14,727,290 packs of Seneca, Opal, King Mountain, Couture, and Sands brand cigarettes to other stores within the state but beyond her reservation.  [She] invoiced over $30 million for these sales.  Several days a week her employees delivered these cigarettes using her own vehicles on state roads and highways. Between March 8, 2007 and October 1, 2013, [Huber] also sold at least 1,969,279 packs of Seneca, Opal, King Mountain, Couture, and Sands brand cigarettes at her retail store. [Huber's] tribe has about 600 members of all ages."  (Fns. omitted.)

All in all, we conclude that the Attorney General has the better of the argument on the issue of preemption.  In circumstances involving conduct that is partially on-reservation and partially off-reservation, "a State may validly assert authority over the

activities of nonmembers on a reservation" if a balancing of interests under *Bracker*, *supra,* 448 U.S. 136 calls for it. (*New Mexico II*, *supra*, 462 U.S. at p. 331.) And in this balancing process, the "State's regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate State intervention." (*Id*. at p. 336; see *Rice v. Rehner* (1983) 463 U.S. 713, 724 ["[Tribe member]'s distribution of liquor has a significant impact beyond the limits of the Pala Reservation. The state has an unquestionable interest in the liquor traffic that occurs within its borders, and this interest is independent of the authority conferred on the States by the Twenty-first Amendment"].)[18] Here in particular, *Moe*, *Colville,* and *Milhelm*, as cigarette sales cases, provide the framework for the appropriate balancing analysis.

A key teaching of *Moe*, *Colville,* and *Milhelm* is that the high court views the issue of state regulation of cigarette sales on Indian reservations through an economic lens, looking not only at the cost advantages of selling noncomplying cigarettes, but to the incentives to lawbreaking that such sales create and the impact of upstream purchasing in the wholesale market for illicit cigarettes. (*Moe*, *supra*, 425 U.S. at pp. 481-483; *Colville*, *supra*, 447 U.S. at pp. 154-155; *Milhelm*, *supra*, 512 U.S. at pp. 73-76.) Looking at this case in the same way, Huber's cigarette sales on the Table Bluff Rancheria in violation of the Directory Act and the Fire Safety Act were no different in kind from the sales of non-tax stamped cigarettes at issue in *Moe*, *Colville,* and *Milhelm*; by flouting those statutes, she gained a cost advantage over retail sellers who bought at wholesale from complying manufacturers. Indeed, that cost advantage appears to have been the foundation of her enterprise, serving as an inducement to nonmembers to visit the Table Bluff Rancheria to avail themselves of prices made possible by this cost

---

[18] See Cohen, *supra,* § 6.02[1], p. 504 ("Where activities occur partially within and partially outside Indian country, and a substantial part of the activity takes place outside, courts have generally upheld nondiscriminatory applications of state jurisdiction").

advantage, and creating a downstream market for wholesalers who distribute noncompliant cigarettes.

Huber argues that *Moe*, *Colville,* and *Milhelm* are merely "tax" cases that have no application outside the "special area of State taxation." (See *Cabazon*, *supra*, 480 U.S. at p. 215, fn. 17.) We are not persuaded. What the phrase "special area" of taxation refers to is the rule that enrolled members of Indian tribes are exempt from state taxation. (*McClanahan*, *supra*, 411 U.S. at p. 171.) Huber overlooks the fact that in *Moe* the court *departs* from this "special area," and it does so because in that case the state law obligation the Indian smokeshops attacked (precollection of excise taxes) was not a tax at all, but rather was an incidental tax enforcement measure directed at ensuring collection from nonmembers (*Moe, supra,* 425 U.S. at pp. 481-483); the same was true in *Colville* (precollection and recordkeeping requirements on retailers) (*Colville, supra,* 447 U.S. at pp. 159-160); and in *Milhelm* (recordkeeping requirements and quantity restrictions on wholesalers) (*Milhelm, supra,* 512 U.S. at pp. 64-67, 73-76). Thus, we reject Huber's argument that *Moe*, *Colville,* and *Milhelm* may be cast aside as oddball tax cases having no significance outside the specialized arena of taxation. Indeed, we view this trio of cases as integral to the entire body of Indian preemption law that has evolved over the last 50 years.

The trial court correctly concluded that the balance of federal, tribal, and state interests weighs in favor of California. Huber points to no federal interest, expressed by statute or regulation, in promoting reservation sales of cigarettes, and makes no claim that Congress, by statute or regulation, delegated to the Wiyots some form of authority that might oust the authority of the state in this area. To the extent the Wiyot Tribe, independently, has an interest in carving out a domain for its members in the cigarette sales business—Ordinance No. 01-10 appears to evidence just such an interest—the holding in *Colville* tells us that does not matter, absent a direct conflict. The court there rejected an invitation to use tribal cigarette tax and marketing regulations as a consideration weighing in favor of preemption. (*Colville, supra,* 447 U.S. at pp. 158-159.) Against a nonexistent federal interest and a limited tribal interest, California has a

35

strong health and safety interest in policing cigarette sales. In the end, therefore, we arrive at the same conclusion the *Black Hawk* court did with respect to the Directory Act and the Fire Safety Act: "The California tobacco directory law promotes public health by increasing the costs of cigarettes and discouraging smoking. [Citations.] The California Cigarette Fire Safety and Firefighter Protection Act law—providing ignition-propensity requirements—serves the public interest in reducing fires caused by cigarettes. . . . [And n]o federal or tribal interest outweighs the state's interest in . . . enforcing the California tobacco directory and cigarette fire safety laws." (*Black Hawk*, *supra*, 197 Cal.App.4th at p. 1571; see also *Rose*, 16 Cal.App.5th at p. 328 [agreeing with *Black Hawk*'s preemption balancing analysis].)

Huber argues that, by obtaining an injunction, which carries with it the threat of contempt, the enforcement steps the Attorney General has taken here—causing the shutdown of her business—go far beyond the "minimal" burdens the *Moe*, *Colville,* and *Milhelm* courts approved. We cannot agree. The burden of complying with the Directory Act and the Fire Safety Act, as the Attorney General points out, falls on manufacturers. Huber's only "burden," if it can even be called that, is to choose product sourcing from manufacturers who comply with those statutes. Huber points out that the court's injunction left her no choice but to shutter her business, but if that is the case the decision to close her business rather than offer cigarettes that comply with California law was her election, apparently looking at the economics of continued operation in compliance with state law. *Colville* is quite clear that the burden was on her to show that the Directory Act and the Fire Safety Act as enforced against her in the first and second causes of action are "not reasonably necessary as a means of preventing fraudulent transactions." (*Colville, supra,* 447 U.S. at p. 160.) She failed to do so.

Huber's complaint about the weight of the injunction does raise a further question under the ultimate test for Indian preemption—whether enjoining on-reservation conduct by an enrolled tribe member infringes on "the right of reservation Indians to make their own laws and be ruled by them." (*Williams*, *supra*, 358 U.S. at p. 220.) Although we agree with the balancing of interests analysis adopted in *Black Hawk* and *Rose*, and

36

although we reach the same conclusion those courts did with respect to the Directory Act and the Fire Safety Act, we note that Huber has a stronger argument for preemption than the defendants did there because, here, unlike in those cases, the trial court enjoined an enrolled tribe member's business activities *on her own reservation*. That puts the issue of possible infringement of tribal self-government more sharply here than in *Black Hawk* or *Rose*. (See *Black Hawk, supra,* 197 U.S. at pp. 1564-1565, 1566-1567; *Rose, supra,* 16 Cal.App.5th at p. 321.)

We are not persuaded this makes a difference, however. In *Colville*, the high court upheld the State of Washington's power to seize illegal cigarettes by *off-reservation* interdiction but saw no need to address whether the state had power to "enter onto the reservations, seize stocks of cigarettes which are intended for sale to nonmembers, and sell those stocks in order to obtain payment of the taxes due." (*Colville*, *supra*, 447 U.S. at p. 162.) This question, which the court described as "considerably different from" the issue of off-reservation seizure, was not properly presented for decision. (*Ibid*.) We, too, see no need to address the question of on-reservation enforcement. At oral argument, the Attorney General stated the off-reservation seizure of goods would be a sufficient means of enforcing the prohibition against the sale of illicit cigarettes. Although *Nevada v. Hicks*, *supra,* 533 U.S. 353, which involved the on-reservation search of a tribe member's residence in a criminal investigation for violation of a game conservation statute (*id.* at pp. 355-356), can be read to suggest that on-reservation enforcement might be permissible where the activity involved presents some risk of harm to state citizens off the reservation, we need not address that issue here in light of the Attorney General's concession. To the extent enforcement occurs off-reservation, the Wiyot right to self-governance is not implicated.

## IV. CONCLUSION

We reverse the order granting summary adjudication to the People on the third cause of action for violation of the UCL. We also reverse the order denying summary adjudication to Huber on the third cause of action for violation of the UCL. We thus vacate the permanent injunction in part, to the extent it relies on and is designed to enjoin

37

violation of the UCL.  In all other respects we affirm, and the case is remanded for further proceedings consistent with this opinion.


_____
Streeter, Acting P.J.


We concur:


_____
Reardon, J.


_____
Smith, J.[*]

---

[*] Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A144214/*People ex rel. v. Huber*

Trial Court:                     Humboldt County Superior Court.

Trial Judge:                     Honorable W. Bruce Watson.

Counsel for Appellant:           Law Office of Dario Navarro, Dario F. Navarro;
                                 Fredericks Peebles & Morgan, Michael A. Robinson,
                                 James Joseph Oaqundah, for defendant and appellant.

Counsel for Respondent:          Xavier Becerra, Attorney General, Karen Leaf, Senior
                                 Assistant Attorney General, Nicholas Martin
                                 Wellington and Erin Wallace Rosenberg, Deputy
                                 Attorneys General, for plaintiff and respondent.